**In re MFW SHAREHOLDERS LITIGATION.**

**C.A. No. 6566–CS.**

Court of Chancery of Delaware.

Submitted: March 11, 2013.
Decided: May 29, 2013.

Peter B. Andrews, Esquire, Faruqi & Faruqi, LLP; Carmella P. Keener, Esquire, Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware; Carl L. Stine, Esquire, Matthew Insley–Pruitt, Esquire, Wolf Popper LLP; Juan E. Monteverde, Esquire, Faruqi & Faruqi, LLP,

New York, New York; Kira German, Esquire, Gardy & Notis LLP, Englewood Cliffs, New Jersey, Attorneys for Plaintiff MFW Stockholders.

Thomas J. Allingham II, Esquire, Joseph O. Larkin, Esquire, Christopher M. Foulds, Esquire, Jessica L. Raatz, Esquire, Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware, Attorneys for Defendants MacAndrews & Forbes Holdings Inc., Ronald O. Perelman, Barry F. Schwartz, and William C. Bevins.

Stephen P. Lamb, Esquire, Meghan M. Dougherty, Esquire, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Wilmington, Delaware; Daniel J. Leffell, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, New York, Attorneys for Defendants M & F Worldwide Corp., Philip E. Beekman, Charles T. Dawson, Theo W. Folz, John M. Keane, Bruce Slovin, and Stephen G. Taub.

William M. Lafferty, Esquire, D. McKinley Measley, Esquire, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware; Tariq Mundiya, Esquire, Todd G. Cosenza, Esquire, Christopher J. Miritello, Esquire, Jill K. Grant, Esquire, Willkie Farr & Gallagher, LLP, Attorneys for Defendants Paul M. Meister, Martha L. Byorum, Viet D. Dinh, and Carl B. Webb.

## OPINION

STRINE, Chancellor.

### I. *Introduction*

This case presents a novel question of law. Here, MacAndrews & Forbes—a holding company whose equity is solely owned by defendant Ronald Perelman—owned 43% of M & F Worldwide ("MFW"). MacAndrews & Forbes offered to purchase the rest of the corporation's equity in a going private merger for $24 per share. But upfront, MacAndrews & Forbes said it would not proceed with any going private transaction that was not approved: (i) by an independent special committee; and (ii) by a vote of a majority of the stockholders unaffiliated with the controlling stockholder (who, for simplicity's sake, are termed the "minority"). A special committee was formed, which picked its own legal and financial advisors. The committee met eight times during the course of three months and negotiated with MacAndrews & Forbes, eventually getting it to raise its bid by $1 per share, to $25 per share. The merger was then approved by an affirmative vote of the majority of the minority MFW stockholders, with 65% of them approving the merger.

MacAndrews & Forbes, Perelman, and the other directors of MFW were, of course, sued by stockholders alleging that the merger was unfair. After initially seeking a preliminary injunction hearing in advance of the merger vote with agreement from the defendants and receiving a good deal of expedited discovery, the plaintiffs changed direction and dropped their injunction motion in favor of seeking a post-closing damages remedy for breach of fiduciary duty.

The defendants have moved for summary judgment as to that claim. The defendants argue that there is no material issue of fact that the MFW special committee was comprised of independent directors, had the right to and did engage qualified legal and financial advisors to inform itself whether a going private merger was in the best interests of MFW's minority stockholders, was fully empowered to negotiate with Perelman over the terms of his offer and to say no definitively if it did not believe the ultimate terms were fair to the MFW minority stockholders, and after an extensive period of deliberation and negotiations,

approved a merger agreement with Perelman. The defendants further argue that there is no dispute of fact that a majority of the minority stockholders supported the merger upon full disclosure and without coercion. Because, the defendants say, the merger was conditioned up front on two key procedural protections that, together, replicate an arm's-length merger—the employment of an active, unconflicted negotiating agent free to turn down the transaction and a requirement that any transaction negotiated by that agent be approved by the disinterested stockholders—they contend that the judicial standard of review should be the business judgment rule. Under that rule, the court is precluded from inquiring into the substantive fairness of the merger, and must dismiss the challenge to the merger unless the merger's terms were so disparate that no rational person acting in good faith could have thought the merger was fair to the minority.[1] On this record, the defendants say, it is clear that the merger, which occurred at a price that was a 47% premium to the stock price before Perelman's offer was made, cannot be deemed waste, a conclusion confirmed by the majority-of-the-minority vote itself.

In other words, the defendants argue that the effect of using both protective devices is to make the form of the going private transaction analogous to that of a third-party merger under Section 251 of the Delaware General Corporation Law. The approval of a special committee in a going private transaction is akin to that of the approval of the board in a third-party transaction, and the approval of the noncontrolling stockholders replicates the approval of all the stockholders.

The question of what standard of review should apply to a going private merger conditioned upfront by the controlling stockholder on approval by *both* a properly empowered, independent committee and an informed, uncoerced majority-of-the-minority vote has been a subject of debate for decades now. For various reasons, the question has never been put directly to this court or, more important, to our Supreme Court.

This is in part due to uncertainty arising from a question that has been answered. Almost twenty years ago, in *Kahn v. Lynch,* our Supreme Court held that the approval by *either* a special committee *or* the majority of the noncontrolling stockholders of a merger with a buying controlling stockholder would shift the burden of proof under the entire fairness standard from the defendant to the plaintiff.[2] Although *Lynch* did not involve a merger conditioned by a controlling stockholder on both procedural protections, statements in the decision could be, and were, read as suggesting that a controlling stockholder who consented to both procedural protections for the minority would receive no extra legal credit for doing so, and that regardless of employing both procedural protections, the merger would be subject to review under the entire fairness standard.

Uncertainty about the answer to a question that had not been put to our Supreme Court thus left controllers with an incentive system all of us who were adolescents (or are now parents or grandparents of adolescents) can understand. Assume you have a teenager with math *and* English

---

1. *E.g., Sinclair Oil Corp. v. Levien,* 280 A.2d 717, 720 (Del.1971) ("A board of directors enjoys a presumption of sound business judgment, and its decisions will not be disturbed if they can be attributed to any rational business purpose.").

2. *Kahn v. Lynch Commc'n Sys. (Lynch I),* 638 A.2d 1110, 1117 (Del.1994).

assignments due Monday morning. If you tell the teenager that she can go to the movies Saturday night if she completes her math *or* English homework Saturday morning, she is unlikely to do both assignments Saturday morning. She is likely to do only that which is necessary to get to go to the movies—*i.e.,* complete one of the assignments—leaving her parents and siblings to endure her stressful last-minute scramble to finish the other Sunday night.

For controlling stockholders who knew that they would get a burden shift if they did one of the procedural protections, but who did not know if they would get any additional benefit for taking the certain business risk of assenting to an additional and potent procedural protection for the minority stockholders, the incentive to use both procedural devices and thus replicate the key elements of the arm's-length merger process was therefore minimal to downright discouraging.

Because of these and other incentives, the underlying question has never been squarely presented to our courts, and lawyers, investment bankers, managers, stockholders, and scholars have wondered what would be the effect on the standard of review of using *both* of these procedural devices.[3] In this decision, Perelman and his codefendants ask this court to answer that question by arguing that because the merger proposal that led to the merger challenged here was conditioned from the time of its proposal on both procedural protections, the business judgment rule standard applies and requires a grant of summary judgment against the plaintiffs' claims.

In this decision, the court answers the question the defendants ask, but only after assuring itself that an answer is in fact necessary. For that answer to be necessary, certain conditions have to exist.

First, it has to be clear that the procedural protections employed qualify to be given cleansing credit under the business judgment rule. For example, if the MFW special committee was not comprised of directors who qualify as independent under our law, the defendants would not be entitled to summary judgment under their own argument. Likewise, if the majority-of-the-minority vote were tainted by a disclosure violation or coercion, the defendants' motion would fail.

The court therefore analyzes whether the defendants are correct that the MFW special committee and the majority-of-the-minority vote qualify as cleansing devices under our law. As to the special committee, the court concludes that the special committee does qualify because there is no triable issue of fact regarding (i) the independence of the special committee, (ii) its ability to employ financial and legal advisors and its exercise of that ability, and (iii) its empowerment to negotiate the merger and definitively to say no to the transaction. The special committee met on eight occasions and there are no grounds for the plaintiffs to allege that the committee did not fulfill its duty of care. As to the majority-of-the-minority vote, the plaintiffs admit that it was a fully informed vote, as they fail to point to any failure of disclo-

---

3. *See, e.g.,* Ronald J. Gilson & Jeffrey N. Gordon, *Controlling Controlling Shareholders,* 152 U. Pa. L.Rev. 785, 839–40 (2003) [hereinafter Gilson & Gordon, *Controlling Shareholders* ]; Peter V. Letsou & Steven M. Haas, *The Dilemma That Should Never Have Been: Minority Freeze–Outs in Delaware,* 61 Bus. Law. 25, 81–93 (2005) [hereinafter Letsou & Haas, *Di-* *lemma* ]; Guhan Subramanian, *Fixing Freezeouts,* 115 Yale L.J. 2, 60–61 (2005) [hereinafter Subramanian, *Fixing Freezeouts* ]; *see also* William T. Allen et al., *Function over Form: A Reassessment of Standards of Review in Delaware Corporation Law,* 56 Bus. Law. 1287, 1306–09 (2001) [hereinafter Allen et al., *Function over Form* ].

sure. Nor is there any evidence of coercion of the electorate.

Second, the court has to satisfy itself that our Supreme Court has not already answered the question. If our Supreme Court has done so, this court is bound by that answer, which may only be altered by the Supreme Court itself or by legislative action. Therefore, the court considers whether the plaintiffs are correct in saying that the Supreme Court has held, as a matter of law, that a controlling stockholder merger conditioned up front on special committee negotiation and approval, and an informed, uncoerced majority-of-the-minority vote must be reviewed under the entire fairness standard, rather than the business judgment rule standard. Although admitting that there is language in prior Supreme Court decisions that can be read as indicating that there are no circumstances when a merger with a controlling stockholder can escape fairness review, the court concludes that this language does not constitute a holding of our Supreme Court as to a question it was never afforded the opportunity to answer. In no prior case was our Supreme Court given the chance to determine whether a controlling stockholder merger conditioned on both independent committee approval and a majority-of-the-minority vote should receive the protection of the business judgment rule. Like the U.S. Supreme Court, our Supreme Court treats as dictum statements in opinions that are unnecessary to the resolution of the case

before the court.[4] The plaintiffs here admit that under this definition of what constitutes binding precedent, our Supreme Court has not spoken to the question, because it has never been asked to answer the question. After reading the prior authority again, the court concludes that the question remains open and that this court must give its own answer in the first instance, while giving important weight to the reasoning of our Supreme Court in its prior jurisprudence.

After resolving these two predicate issues, the court answers the important question asked by the defendants in the affirmative. Although rational minds may differ on the subject, the court concludes that when a controlling stockholder merger has, from the time of the controller's first overture, been subject to (i) negotiation and approval by a special committee of independent directors fully empowered to say no, and (ii) approval by an uncoerced, fully informed vote of a majority of the minority investors, the business judgment rule standard of review applies. This conclusion is consistent with the central tradition of Delaware law, which defers to the informed decisions of impartial directors, especially when those decisions have been approved by the disinterested stockholders on full information and without coercion. Not only that, the adoption of this rule will be of benefit to minority stockholders because it will provide a strong incentive for controlling stockhold-

---

4. *See, e.g., Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 66–67, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (defining the binding holding of an opinion as "the result [and] also those portions of the opinion necessary to that result," and contrasting it with dictum); *Brown v. United Water Del., Inc.,* 3 A.3d 272, 276 & n. 17 (Del.2010) (describing as dictum judicial statements that "would have no effect on the outcome of the case") (citation and internal quotation omitted); *Crown EMAK*

*P'rs, LLC v. Kurz,* 992 A.2d 377, 398 (Del. 2010) (noting that a lower court ruling was "unnecessary ... to decide [the] issue," and thus dictum "without precedential effect"); *Black's Law Dictionary* (9th ed.2009) (illustrating dictum in opinions as "passages [that] are not essential to the deciding of the very case" (quoting William M. Lile et al., *Brief Making and the Use of Law Books* 307 (3d ed.1914))).

ers to accord minority investors the transactional structure that respected scholars believe will provide them the best protection,[5] a structure where stockholders get the benefits of independent, empowered negotiating agents to bargain for the best price and say no if the agents believe the deal is not advisable for any proper reason, plus the critical ability to determine for themselves whether to accept any deal that their negotiating agents recommend to them. A transactional structure with both these protections is fundamentally different from one with only one protection. A special committee alone ensures only that there is a bargaining agent who can negotiate price and address the collective action problem facing stockholders, but it does not provide stockholders any chance to protect themselves. A majority-of-the-minority vote provides stockholders a chance to vote on a merger proposed by a controller-dominated board, but with no chance to have an independent bargaining agent work on their behalf to negotiate the merger price, and determine whether it is a favorable one that the bargaining agent commends to the minority stockholders for acceptance at a vote. These protections are therefore incomplete and not substitutes, but are complementary and effective in tandem.

Not only that, a controller's promise that it will not proceed unless the special committee assents ensures that the committee will not be bypassed by the controller through the intrinsically more coercive setting of a tender offer. It was this threat of bypass that was of principal con-

cern in *Lynch* and cast doubt on the special committee's ability to operate effectively.[6] Precisely because the controller can only get business judgment rule treatment if it foregoes the chance to go directly to stockholders, any potential for coercion is minimized. Indeed, given the high-profile promise the controller has to make not to proceed without the committee's approval, any retributive action would be difficult to conceal, and the potent tools entrusted to our courts to protect stockholders against violations of the duty of loyalty would be available to police retributive action. As important, market realities provide no rational basis for concluding that stockholders will not vote against a merger they do not favor. Stockholders, especially institutional investors who dominate market holdings, regularly vote against management on many issues, and do not hesitate to sue, or to speak up. Thus, when such stockholders are given a free opportunity to vote no on a merger negotiated by a special committee, and a majority of them choose to support the merger, it promises more cost than benefit to investors generally in terms of the impact on the overall cost of capital to have a standard of review other than the business judgment rule. That is especially the case because stockholders who vote no, and do not wish to accept the merger consideration in a going private transaction despite the other stockholders' decision to support the merger, will typically have the right to seek appraisal.[7]

In addition, if the approach taken were applied consistently to the equitable re-

5. *E.g.*, Gilson & Gordon, *Controlling Shareholders*, at 839–40; Subramanian, *Fixing Freezeouts*, at 60–61.

6. *Lynch I*, 638 A.2d 1110; *see also, e.g., Am. Gen. Corp. v. Tex. Air Corp.*, 1987 WL 6337, at *181 (Del.Ch. Feb. 5, 1987) (noting, on an application for a preliminary injunction, that when the special committee members were told that they must accept the controller's proposal or the transaction would proceed without their input, the burden to prove the entire fairness of the transaction likely would not shift at trial).

7. *See* 8 *Del. C.* § 262.

view of going private transactions proposed by controllers through tender offers, an across-the-board incentive would be created to provide minority stockholders with the best procedural protections in all going private transactions. Whether proceeding by a merger or a tender offer, a controlling stockholder would recognize that it would face entire fairness review unless it agreed not to proceed without the approval of an independent negotiator with the power to say no, and without the uncoerced, fully informed consent of a majority of the minority. This approach is consistent with *Lynch* and its progeny, as a controller who employed only one of the procedural protections would continue to get burden-shifting credit within the entire fairness rubric, but could not escape an ultimate judicial inquiry into substantive fairness. Importantly, by also providing transactional planners with a basis to structure transactions from the beginning in a manner that, if properly implemented, qualifies for the business judgment rule, the benefit-to-cost ratio of litigation challenging controlling stockholders for investors in Delaware corporations will improve, as suits will not have settlement value simply because there is no feasible way for defendants to get them dismissed on the pleadings.

This approach promises minority stockholders a great deal in terms of increasing the prevalence of employing both fairness-enhancing protections in more transactions—most notably, by giving investors a more constant chance to protect themselves at the ballot box through more prevalent majority-of-the-minority voting conditions. It also seems to come at very little cost, owing to the lack of evidence that entire fairness review in cases where both procedural protections are employed adds any real value that justifies the clear costs to diversified investors that such litigation imposes. Thus, respected scholars deeply concerned about the well-being of minority stockholders support this approach as beneficial for minority stockholders.[8] For the same reason, the court embraces it, and therefore grants the defendants' motion for summary judgment.

## II. *The Structure Of This Decision*

Consistent with the introduction, this opinion will first address whether, under the undisputed facts of record, the defendants are correct that the MFW special committee and the majority-of-the minority provision qualify as cleansing devices under Delaware's approach to the business judgment rule. After addressing that issue, the court then considers whether our Supreme Court has answered the question of what judicial standard of review applies to a merger with a controlling stockholder conditioned upfront on a promise that no transaction will proceed without (i) special committee approval, and (ii) the affirmative vote of a majority of the minority stockholders. Finally, having concluded that the question has not been answered by our Supreme Court, this court answers the question itself.

In keeping with this structure, therefore, the court begins by discussing the undisputed facts that are relevant to deciding the legal issues raised by the pending motion for summary judgment, applying the familiar procedural standard.[9] That

8. Gilson & Gordon, *Controlling Shareholders,* at 839–40; Subramanian, *Fixing Freezeouts,* at 60–61.

9. "Summary judgment may be granted if there are no material issues of fact in dispute and the moving party is entitled to judgment as a matter of law. The facts, and all reasonable inferences, must be considered in the light most favorable to the nonmoving party." *Lyondell Chem. Co. v. Ryan,* 970 A.2d 235, 241 (Del.2009) (citation omitted).

motion seeks summary judgment on the ground that the two procedural devices in question qualify as cleansing devices and, taken together, warrant application of the business judgment rule. Because the merger's terms are indisputably ones that a rational person could think fair to the minority stockholders, the defendants say that summary judgment is warranted.[10]

For their part, the plaintiffs argue that there are material questions of fact regarding the independence of the special committee. The plaintiffs also raise debatable issues of valuation, similar to those that are typically addressed in an appraisal or in the part of entire fairness analysis dealing with the substantive fairness of a merger price. Most important, however, the plaintiffs argue that regardless of whether the MFW special committee and the majority-of-the-minority vote qualify as cleansing devices, this court must still hold a trial and determine for itself whether the merger was entirely fair. At best, the defendants are entitled to a shift in the burden of persuasion on that point at trial under the preponderance of the evidence standard. But that slight tilt is all, the plaintiffs say, that is permitted under prior precedent.

### III. The Procedural Devices Used To Protect The Minority Are Entitled To Cleansing Effect Under Delaware's Traditional Approach To The Business Judgment Rule

Determining whether the defendants are entitled to judgment that, as a matter of law, the MFW special committee and the majority-of-the-minority vote condition should be given cleansing effect, necessitates a discussion of how the merger came about.

### A. MacAndrews & Forbes Proposes To Take MFW Private

MFW is a holding company incorporated in Delaware. Before the merger that is the subject of this dispute, MFW was 43.4% owned by MacAndrews & Forbes, which is entirely owned by Ron Perelman.[11] MFW had four business segments. Three of these were owned through a holding company, Harland Clarke Holding Corporation ("HCHC"). These are the Harland Clarke Corporation ("Harland"), which printed bank checks;[12] Harland Clarke Financial Solutions, which provided technology products and services to financial services companies;[13] and Scantron Corporation, which manufactured scanning equipment used for educational and other purposes.[14] The fourth segment, which was not part of HCHC, was Mafco Worldwide Corporation, a manufacturer of licorice flavorings.[15]

The MFW board had thirteen members. The members were Ron Perelman, Barry Schwartz, William Bevins, Bruce Slovin, Charles Dawson, Stephen Taub, John Keane, Theo Folz, Philip Beekman, Martha Byorum, Viet Dinh, Paul Meister, and Carl Webb.[16] Perelman, Schwartz, and Bevins had roles at both MFW and MacAndrews & Forbes. Perelman was the Chairman of MFW, and the Chairman and CEO of MacAndrews & Forbes; Schwartz was the President and CEO of MFW, and

---

**10.** See, e.g., Sinclair Oil Corp. v. Levien, 280 A.2d 717, 720 (Del.1971).

**11.** Defs.' Ex. 2, at 18 (M & F Worldwide Corp., Proxy Statement (Schedule 14A) (Nov. 18, 2011)) [hereinafter Proxy].

**12.** Id. at 97.

**13.** Id.

**14.** Id.

**15.** Id.

**16.** Id. at 97–100.

the Vice Chairman and Chief Administrative Officer of MacAndrews & Forbes; and Bevins was a Vice President at MacAndrews & Forbes.[17]

In May 2011, Perelman began to explore the possibility of taking MFW private. At that time, MFW's stock price traded in the $20 to $24 range.[18] MacAndrews & Forbes engaged the bank Moelis & Company to advise it. Moelis prepared valuations based on projections that had been supplied to lenders by MFW in April and May 2011.[19] Moelis valued MFW at between $10 and $32 a share.[20]

On June 10, 2011, MFW's shares closed on the New York Stock Exchange at $16.96.[21] The next business day, June 13, 2011, Schwartz sent a proposal to the MFW board to buy the remaining shares for $24 in cash.[22] The proposal stated, in relevant part:

> The proposed transaction would be subject to the approval of the Board of Directors of the Company [*i.e.*, MFW] and the negotiation and execution of mutually acceptable definitive transaction documents. It is our expectation that the Board of Directors will appoint a special committee of independent directors to consider our proposal and make a recommendation to the Board of Directors. *We will not move forward with the transaction unless it is approved by such a special committee. In addition, the transaction will be subject to a non-waivable condition requiring the approval of a majority of the shares* *of the Company not owned by M & F or its affiliates.* . . .
>
> . . . In considering this proposal, you should know that in our capacity as a stockholder of the Company we are interested only in acquiring the shares of the Company not already owned by us and that in such capacity we have no interest in selling any of the shares owned by us in the Company nor would we expect, in our capacity as a stockholder, to vote in favor of any alternative sale, merger or similar transaction involving the Company. If the special committee does not recommend or the public stockholders of the Company do not approve the proposed transaction, such determination would not adversely affect our future relationship with the Company and we would intend to remain as a long-term stockholder.
>
> . . . .
>
> In connection with this proposal, we have engaged Moelis & Company as our financial advisor and Skadden, Arps, Slate, Meagher & Flom LLP as our legal advisor, and we encourage the special committee to retain its own legal and financial advisors to assist it in its review.[23]

MacAndrews & Forbes filed this letter with the SEC and issued a press release containing substantially the same information.[24]

**B.** *The MFW Board Forms A Special Committee Of Independent Directors To Consider The Offer*

The MFW board met the following day

---

**17.** *Id.*

**18.** *Id.* at 39.

**19.** Defs.' Ex. 17 (Moelis discussion materials (June 9, 2011)).

**20.** *Id.*

**21.** Proxy 50.

**22.** Defs.' Ex. 18 (MacAndrews & Forbes proposal letter (June 13, 2011)).

**23.** *Id.* (emphasis added).

**24.** *See id.*

to consider the proposal.[25] At the meeting, Schwartz presented the offer on behalf of MacAndrews & Forbes. Schwartz and Bevins, as the two directors present who were also on the MacAndrews & Forbes board, then recused themselves from the meeting, as did Dawson, the CEO of HCHC, who had previously expressed support for the offer.[26] The independent directors then invited counsel from Willkie Farr & Gallagher, which had recently represented a special committee of MFW's independent directors in relation to a potential acquisition of a subsidiary of MacAndrews & Forbes, to join the meeting. The independent directors decided to form a special committee, and resolved further that:

[T]he Special Committee is empowered to: (i) make such investigation of the Proposal as the Special Committee deems appropriate; (ii) evaluate the terms of the Proposal; (iii) negotiate with Holdings [i.e., MacAndrews & Forbes] and its representatives any element of the Proposal; (iv) negotiate the terms of any definitive agreement with respect to the Proposal (it being understood that the execution thereof shall be subject to the approval of the Board); (v) report to the Board its recommendations and conclusions with respect to the Proposal, including a determination and recommendation as to whether the Proposal is fair and in the best interests of the stockholders of the Company other than Holdings and its affiliates and should be approved by the Board; and

(vi) determine to elect not to pursue the Proposal. . . .

. . . .

. . . [T]he Board shall not approve the Proposal without a prior favorable recommendation of the Special Committee. . . .

. . . [T]he Special Committee [is] empowered to retain and employ legal counsel, a financial advisor, and such other agents as the Special Committee shall deem necessary or desirable in connection with these matters. . . . [27]

The special committee consisted of Byorum, Dinh, Meister (the chair), Slovin, and Webb.[28] The following day, Slovin recused himself because, although the board had determined that he qualified as an independent director under the rules of the New York Stock Exchange, he had "some current relationships that could raise questions about his independence for purposes of serving on the special committee."[29]

## C. The Special Committee Was Empowered To Negotiate And Veto The Transaction

■ It is undisputed that the special committee was empowered to hire its own legal and financial advisors. Besides hiring Willkie Farr as its legal advisor, the special committee engaged Evercore Partners as its financial advisor.

It is also undisputed that the special committee was empowered not simply to "evaluate" the offer, like some special committees with weak mandates,[30] but to nego-

25. Defs.' Ex. 19 (MFW board minutes (June 14, 2011)).

26. See id.

27. Id.

28. Id.

29. Defs.' Ex. 28 (email from Michael Schwartz to the special committee (June 15, 2011)).

30. See, e.g., Ams. Mining Corp. v. Theriault, 51 A.3d 1213, 1244–46 (Del.2012) (noting that a special committee that could only "evaluate" an offer had a "narrow mandate"); Brinckerhoff v. Tex. E. Prods. Pipeline Co., LLC, 986

tiate with MacAndrews & Forbes over the terms of its offer to buy out the noncontrolling stockholders. Critically, this negotiating power was accompanied by the clear authority to say no definitively to MacAndrews & Forbes. Thus, unlike in some prior situations that the court will discuss, MacAndrews & Forbes promised that it would not proceed with any going private proposal that did not have the support of the special committee. Therefore, the MFW committee did not have to fear that if it bargained too hard, MacAndrews & Forbes could bypass the committee and make a tender offer directly to the minority stockholders. Rather, the special committee was fully empowered to say no and make that decision stick.

Although the special committee had the authority to negotiate and say no, it did not have the practical authority to market MFW to other buyers. In its announcement, MacAndrews & Forbes plainly stated that it was not interested in selling its 43% stake. Under Delaware law, MacAndrews & Forbes had no duty to sell its block,[31] which was large enough, as a practical matter, to preclude any other buyer from succeeding unless it decided to be-

come a seller. And absent MacAndrews & Forbes declaring that it was open to selling, it was unlikely that any potentially interested party would incur the costs and risks of exploring a purchase of MFW. This does not mean, however, that the MFW special committee did not have the leeway to get advice from its financial advisor about the strategic options available to MFW, including the potential interest that other buyers might have if MacAndrews & Forbes was willing to sell. The record is undisputed that the special committee did consider, with the help of its financial advisor, whether there were other buyers who might be interested in purchasing MFW,[32] and whether there were other strategic options, such as asset divestitures, that might generate more value for minority stockholders than a sale of their stock to MacAndrews & Forbes.[33]

For purposes of this motion, therefore, there is undisputed evidence that the special committee could and did hire qualified legal and financial advisors; that the special committee could definitely say no; that the special committee could and did study a full range of financial information to inform itself, including by evaluating

---

A.2d 370, 381 (Del.Ch.2010) (observing that a special committee should have the mandate to "review, evaluate, negotiate, and to recommend, or reject, a proposed merger").

**31.** *E.g., Bershad v. Curtiss–Wright Corp.,* 535 A.2d 840, 844–45 (Del.1987).

**32.** Meister Dep. 116:3–117:9 (testifying that Evercore analyzed the possibility of selling MFW to a private equity buyer, and that, after this analysis, the special committee did not believe that such a sale was likely to create value); *id.* at 118:23–119:12 (testifying that Evercore had received "one or two ... fishing expedition phone calls," but that Evercore did not believe that they had been from anyone "capable or interested"); Defs.' Ex. 24 (minutes of special committee (Aug. 10, 2011)) (stating that Evercore and the special committee discussed the option of selling MFW).

**33.** Defs.' Ex. 13 (Evercore discussion materials (June 20, 2011)) (stating that the special committee had leverage by being able to "explor[e] alternative paths to value creation, such as breaking up the Company or sale of selected assets"); Defs.' Ex. 31 (Evercore discussion materials (Aug. 17, 2011)) (illustrative transaction of value of company if Harland Clarke payments business was sold to a competitor, for cash); Defs.' Ex. 25 (minutes of special committee (Aug. 17, 2011)) (stating that Evercore informed the special committee that Harland Clarke's main competitor, Deluxe, would not make a bid for Harland Clarke that would increase MFW's stock price); Dinh Dep. 168:6–14 (testifying that Evercore informed the special committee that financial buyers would be unlikely to want to bid for parts of MFW).

other options that might be open to MFW; and that the special committee could and, as we shall see, did negotiate with MacAndrews & Forbes over the terms of its offer.

### D. *The Independence Of The Special Committee*

One of the plaintiffs' major arguments against summary judgment is that the MFW special committee was not comprised of directors who meet the definition of independence under our law. Although the plaintiffs concede the independence of the special committee's chairman (Meister), they challenge the independence of each of the other three members, contending that various business and social ties between these members and MacAndrews & Forbes render them beholden to MacAndrews & Forbes and its controller Perelman, or at least create a permissible inference that that is so, thus defeating a key premise of the defendants' summary judgment motion.

To evaluate the parties' competing positions, the court applies settled authority of our Supreme Court. Under Delaware law, there is a presumption that directors are independent.[34] To show that a

director is not independent, a plaintiff must demonstrate that the director is "beholden" to the controlling party "or so under [the controller's] influence that [the director's] discretion would be sterilized."[35] Our law is clear that mere allegations that directors are friendly with, travel in the same social circles, or have past business relationships with the proponent of a transaction or the person they are investigating, are not enough to rebut the presumption of independence.[36] Rather, the Supreme Court has made clear that a plaintiff seeking to show that a director was not independent must meet a materiality standard, under which the court must conclude that the director in question's material ties to the person whose proposal or actions she is evaluating are sufficiently substantial that she cannot objectively fulfill her fiduciary duties.[37] Consistent with the overarching requirement that any disqualifying tie be material, the simple fact that there are some financial ties between the interested party and the director is not disqualifying. Rather, the question is whether those ties are *material*, in the sense that the alleged ties could have af-

---

34. *Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984).

35. *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993) (citing *Aronson*, 473 A.2d at 815).

36. *Beam ex rel. Martha Stewart Living Omnimedia v. Stewart*, 845 A.2d 1040, 1051–52 (Del.2004).

37. *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1167 (Del.1995) ("[A] shareholder plaintiff [must] show the materiality of a director's self-interest to the ... director's independence....") (citation omitted); *see Brehm v. Eisner*, 746 A.2d 244, 259 n. 49 (Del.2000) ("The term 'material' is used in this context to mean relevant and of a magnitude to be important to directors in carrying out their fiduciary duty of care in decisionmaking.").
Even in the context of personal, rather than financial, relationships, the materiality re-

quirement does not mean that the test cannot be met. For example, it is sometimes blithely written that "mere allegations of personal friendship" do not cut it. More properly, this statement would read "mere allegations of mere friendship" do not qualify. If the friendship was one where the parties had served as each other's maids of honor, had been each other's college roommates, shared a beach house with their families each summer for a decade, and are as thick as blood relations, that context would be different from parties who occasionally had dinner over the years, go to some of the same parties and gatherings annually, and call themselves "friends." *See, e.g., Telxon Corp. v. Meyerson*, 802 A.2d 257, 264 (Del.2002) (noting that a director may lack independence on account of a "close personal or familial relationship").

fected the impartiality of the director.[38] Our Supreme Court has rejected the suggestion that the correct standard for materiality is a "reasonable person" standard; rather, it is necessary to look to the financial circumstances of the director in question to determine materiality.[39]

Before examining each director the plaintiffs challenge as lacking independence, it is useful to point out some overarching problems with the plaintiffs' arguments. Despite receiving the chance for extensive discovery, the plaintiffs have done nothing, as shall be seen, to compare the actual economic circumstances of the directors they challenge to the ties the plaintiffs contend affect their impartiality. In other words, the plaintiffs have ignored a key teaching of our Supreme Court, requiring a showing that a specific director's independence is compromised by factors material to her.[40] As to each of the specific directors the plaintiffs challenge, the plaintiffs fail to proffer any real evidence of their economic circumstances. Furthermore, MFW was a New York Stock Exchange-listed company. Although the fact that directors qualify as independent under the NYSE rules does not mean that they are necessarily independent under our law in particular circumstances,[41] the NYSE rules governing director independence were influenced by experience in Delaware and other states and were the

subject of intensive study by expert parties. They cover many of the key factors that tend to bear on independence, including whether things like consulting fees rise to a level where they compromise a director's independence,[42] and they are a useful source for this court to consider when assessing an argument that a director lacks independence. Here, as will be seen, the plaintiffs fail to argue that any of the members of the special committee did not meet the specific, detailed independence requirements of the NYSE.

With those overarching considerations in mind, the court turns to a consideration of the plaintiffs' challenge to the members of the special committee. Here, an application of our Supreme Court's teachings to the challenged directors in alphabetical order reveals that the defendants are correct, and that there is no dispute of fact that the MFW special committee was comprised solely of directors who were independent under our Supreme Court's jurisprudence.

### 1. *Byorum*

■ Director Byorum is a vice president and co-head of the international group at Stephens, an investment bank.[43] She was a director of MFW from 2007, and served on the audit committee.[44] As was mentioned, the plaintiffs do nothing to il-

---

38. *E.g., Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 363 (Del.1993) (affirming Court of Chancery's requirement that a "a shareholder show ... the materiality of a director's self-interest to the given director's independence" as a "restatement of established Delaware law"); *see also, e.g., Grimes v. Donald*, 673 A.2d 1207, 1216 (Del.1996) (stating, in the context of demand futility, that a stockholder must show that "a majority of the board has a *material* financial or familial interest" (emphasis added and citation omitted)).

39. *Cede*, 634 A.2d at 364.

40. *King v. VeriFone Hldgs., Inc.*, 12 A.3d 1140, 1145 n. 24 (Del.2011) (citation omitted); *Grimes*, 673 A.2d at 1216.

41. *In re Oracle Corp. Deriv. Litig.*, 824 A.2d 917, 941 n. 62 (Del.Ch.2003).

42. *See* N.Y. Stock Exchange, *Listed Company Manual* § 303A.02 (2013), http://nysemanual. nyse.com/lcm [hereinafter NYSE Rules] ("Independence Tests").

43. Byorum Dep. 11:17–21.

44. *Id.* at 13:15–16, 88:20–23.

lustrate the actual economic circumstances of Byorum, other than say she has worked in finance. Thus, the plaintiffs do nothing to show that there is a triable issue of fact that any of the factors they focus on were material to Byorum based on her actual economic circumstances.

The plaintiffs allege, in a cursory way, that Byorum has a personal relationship with Perelman, and that she had a business relationship with him while she worked at Citibank in the nineties.[45] Byorum got to know Barry Schwartz, the CEO of MFW, and Howard Gittis, Perelman's close aide and the CEO of MacAndrews & Forbes, while working at Citibank in the nineties.[46] Gittis asked her to serve on the MFW board.[47] In 2007, Byorum, while working on behalf of Stephens Cori, an affiliate of Stephens, initiated a project for Scientific Games, an entity in which MacAndrews & Forbes owns a 37.6% stake.[48] Stephens Cori received a $100,000 retainer fee for this work, and, if the project had been successful, would have received more.[49]

Taken together, these allegations and the record facts on which they are based do not create a triable issue of fact regarding Byorum's independence. The allegations of friendliness—for example, that Byorum has been to Perelman's house—

are exactly of the immaterial and insubstantial kind our Supreme Court held were not material in *Beam v. Stewart.*[50] The plaintiffs do not specify the nature of the business relationship between Byorum and Perelman during Byorum's time at Citigroup, beyond claiming that Byorum would "come into contact" with him in her capacity as a senior executive.[51] This vague relationship does not cast her independence into doubt: the plaintiffs have made no showing that Byorum has an ongoing relationship with Perelman that was material to her in any way.[52] The plaintiffs even admit the unsurprising fact that Perelman had multiple dealings with the financial giant Citigroup over the years, thus undermining the relative importance of any connection that Byorum personally had with him.[53] And, the plaintiffs do not allege that Byorum has a deeper friendship with Schwartz and Gittis than she does with Perelman, and no facts in the record suggest any emotional depth to these relationships at all. Therefore, these allegations do not undermine her independence either.

More important, the plaintiffs have not made any genuine attempt to show that the $100,000 fee that Stephens Cori earned was material to Stephens Cori, much less to Byorum on a personal level given her

45. Pls.' Br. in Opp'n 13–14; Byorum Dep. 56:6–60:3.

46. Byorum Dep. 14:2–9.

47. *Id.* at 20:15–20.

48. *Id.* at 57:12–17, 60:22–61:4.

49. *Id.* at 59:14–20.

50. *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart,* 845 A.2d 1040, 1050–54 (Del.2004); *see* Byorum Dep. 19:4–6.

51. Byorum Dep. 16:5–9.

52. *See, e.g., Crescent/Mach I P'rs, L.P. v. Turner,* 846 A.2d 963, 980–81 (Del.Ch.2000) (holding that an allegation that there was a "long-standing 15–year professional and personal relationship" between the controlling stockholder and a director "alone fails to raise a reasonable doubt that [the director] could not exercise his independent business judgment in approving the transaction"); *State of Wisc. Inv. Bd. v. Bartlett,* 2000 WL 238026, at *6 (Del.Ch. Feb. 24, 2000) ("Evidence of personal and/or past business relationships does not raise an inference of self-interest.").

53. Pls.' Br. in Opp'n 13.

personal economic and professional circumstances.[54] Nor have the plaintiffs tried to show that this modest transactional fee—which is only one tenth of the $1 million that Stephens Cori would have had to have received for Byorum not to be considered independent under the NYSE rules—created a "sense of beholdenness" on the part of Byorum.[55] Thus, there is no genuine issue of material fact as to Byorum's independence.

## 2. Dinh

■ The plaintiffs next challenge the independence of Dinh, who was a member of MFW's Nominating and Corporate Governance Committees.[56] Dinh is a professor at the Georgetown University Law Center and a co-founder of Bancroft, a Washington D.C. law firm.[57] Aside from these facts about Dinh's professional activities, the plaintiffs have not explained how they relate to Dinh's economic circumstances. The concept of materiality is an inherently comparative one, requiring consideration of whether something is material to something else.[58] As a result, the

plaintiffs have done nothing to demonstrate that there is a triable issue of fact based on any of the factors they have brought up.

Dinh's firm, Bancroft, has advised MacAndrews & Forbes and Scientific Games since 2009, and it is undisputed that Bancroft received approximately $200,000 in fees in total from these two companies between 2009 and 2011.[59] The plaintiffs have also alleged that Dinh had a close personal and business relationship with Schwartz.[60] Schwartz sits on the Board of Visitors of the Georgetown University Law Center, where Dinh is a tenured professor, and Schwartz requested that Dinh join the board of another Perelman corporation, Revlon, in 2012.[61]

But these allegations do not create any issue of fact as to Dinh's independence. As is the case with Byorum, the plaintiffs have not put forth any evidence that tends to show that the $200,000 fee paid to Dinh's firm was material to Dinh personally, given his roles at both Georgetown and

54. The plaintiffs acknowledge that Byorum is wealthy: they describe her as a banking "big shot" and point out that she owns a house in the Hamptons. *Id.* at 13–14.

55. Randy J. Holland, *Delaware Directors' Fiduciary Duties: The Focus on Loyalty*, 11 U. Pa. J. Bus. L. 675, 688 (2009) (citation and quotation marks omitted); *see Beam*, 845 A.2d at 1054 & n. 37 (discussing the concept of beholdenness); Byorum Dep. 56:6–60:3; NYSE Rules § 303A.02(b)(v) (providing that a director is not independent if he or she "is a current employee ... of a company that has ... received payments from, the listed company for property or services in an amount which, in any of the last three fiscal years, exceeds the greater of $1 million, or 2% of such other company's consolidated gross revenues"). And, even if the amount paid to Stephens Cori exceeded $1 million, Byorum would still be considered independent under the NYSE rules, because that relationship is

stale (*i.e.*, she was paid over three years before the MFW transaction).

56. Dinh Dep. 173:4–10.

57. *Id.* at 14:8–15:4, 80:17–24.

58. *See Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1167 (Del.1995); *see also, e.g., Gantler v. Stephens*, 965 A.2d 695, 708 (Del. 2009) (holding that the plaintiffs had adequately alleged that a defendant director was not disinterested on account of his business relationship with the company whose board he sat on, because he was a "man of comparatively modest means").

59. Dinh Dep. 72:5–75:21.

60. Pls.' Br. in Opp'n 15–16.

61. Dinh Dep. 18:25–19:7, 23:15–17, 80:17–81:5.

Bancroft.[62] The fees paid to Bancroft are, as in the case of the fees paid to Scientific Games on account of Byorum's work, a fraction of what would need to be paid for Dinh no longer to be considered an independent director under the New York Stock Exchange rules, and would not fund Bancroft's total costs for employing a junior associate for a year. Nor have the plaintiffs offered any evidence that might show that this payment was material in any way to Dinh, given his personal economic circumstances.

Furthermore, Dinh's relationship with Schwartz does not cast his independence into doubt. Dinh was a tenured professor long before he knew Schwartz.[63] And there is no evidence that Dinh has any role at Georgetown in raising funds from alumni or other possible donors, or any other evidence suggesting that the terms or conditions of Dinh's employment at Georgetown could be affected in any way by his recommendation on the merger.[64] Likewise, the fact that Dinh was offered a directorship on the board of Revlon, another Perelman company, *after* he served on the MFW special committee does not create a genuine issue of fact regarding his independence.[65]

### 3. *Webb*

■ Finally, the plaintiffs challenge the independence of Webb, who was a member of MFW's audit committee.[66] Webb was, at the time of the MFW transaction, a banking executive.[67] The plaintiffs allege that Webb has known Perelman since at least 1988, when Perelman invested in failed thrifts with the banker Gerald J. Ford, and that Webb was President and Chief Operating Officer of their investment vehicles.[68] According to the plaintiffs, Webb and Perelman both made a "significant" amount of money in turning around the thrifts, which they sold to Citigroup for $5 billion in 2002.[69] But, once

---

62. *See, e.g., In re Freeport–McMoran Sulphur, Inc. S'holders Litig.*, 2001 WL 50203, at *4–5 (Del.Ch. Jan. 11, 2001) (finding that a consulting fee of $230,000, increased to $330,000 after the merger, did not cast doubt on a director's independence, where the plaintiffs had not alleged that the fee was material to the director); *In re Walt Disney Co. Deriv. Litig.*, 731 A.2d 342, 360 (Del.Ch.1998), *rev'd in part on other grounds sub nom. Brehm v. Eisner*, 746 A.2d 244 (Del.2000) (finding that legal and consulting fees of $175,000 paid by Disney to Senator George Mitchell and his law firm did not cast doubt on his independence, where the plaintiffs had not alleged that the fees were material to Mitchell).

63. Dinh Dep. 80:25–81:5.

64. If Dinh were the Dean, that fact would be contextually ·important. Likewise, if Dinh were the head of a distinct organization within the law school (*e.g.*, a center for corporate governance or for the study of some subject in which he has an interest) that sought funds from alumni such as Schwartz, that context would be important to consider in applying the Supreme Court's materiality test. But

even then, that relationship would have to be contextually material. *See In re Oracle Corp. Deriv. Litig.*, 824 A.2d 917, 930 & n. 21 (Del. Ch.2003) (discussing cases in which this court has decided the independence of directors with fundraising responsibilities at universities).

65. If Dinh's directorship of Revlon were to be relevant to his independence at the time of the MFW transaction, the plaintiffs would need to provide record evidence creating a triable issue of fact that he was offered the directorship *before* the special committee approved the deal, or that it had at least been discussed with him before this time. The only record evidence is to the contrary. Dinh Dep. 24:6–9.

66. Pls.' Br. in Opp'n 15–18.

67. Webb Dep. 19:18–22.

68. Pls.' Br. in Opp'n 15–18; Webb Dep. 7:8–9:5.

69. Pls.' Br. in Opp'n 17; Webb Dep. 15:16–17.

again, the plaintiffs have ignored Webb's economic circumstances in attempting to create a triable issue of fact about his independence. Despite touting the business success that Webb enjoyed alongside Perelman, counsel for the plaintiffs claimed at oral argument that his wealth was *not* relevant to his independence, and only begrudgingly conceded that Webb might be "seriously rich." [70]

The profit that Webb realized from coinvesting with Perelman nine years before the transaction at issue in this case does not call into question his independence. In fact, it tends to strengthen the argument that Webb is independent, because his current relationship with Perelman would likely be economically inconsequential to him. And, there is no evidence that Webb and Perelman had any economic relationship in the nine years before this merger that was material to Webb, given his existing wealth. Therefore, the only challenge that the plaintiffs may make to Webb's independence is the existence of a distant business relationship—which is not sufficient to challenge his independence under our law.[71]

For all these reasons, therefore, the MFW special committee was, as a matter of law, comprised entirely of independent directors.

### E. There Is No Dispute Of Fact That The MFW Special Committee Satisfied Its Duty Of Care

■ The plaintiffs do not make any attempt to show that the MFW special committee failed to meet its duty of care, in the sense of making an informed decision regarding the terms on which it would be advantageous for the minority stockholders to sell their shares to MacAndrews & Forbes.[72] At its first meeting, the special committee interviewed four financial advisors, before hiring Evercore Partners.[73] Such an interview process not only lets the client consider a number of qualified advisors and, one hopes, therefore get better financial terms from the winner because the winner knows it has competition. The process has another utility, which is that each of the pitching firms present "pitch books" relevant to the potential engagement, and give the committee a chance to hear preliminary thoughts from a variety of well qualified financial advisors, a process that therefore helps the committee begin to get fully grounded in the relevant economic factors.

From the outset, the special committee and Evercore had projections that had been prepared by MFW's business segments in April and May 2011.[74] Early in its process, Evercore and the special committee requested MFW to produce new projections that reflected the manage-

---

**70.** Oral Arg. Tr. 115:4–7.

**71.** *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1051 (Del.2004) ("Allegations that [the controller] and the other directors ... developed business relationships before joining the board ... are insufficient, without more, to rebut the presumption of independence."); *see also Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 980 (Del.Ch.2000).

**72.** "[A] director's duty to exercise an informed judgment is in the nature of a duty of care...." *Smith v. Van Gorkom*, 488 A.2d 858, 872–73 (Del.1985); *see also Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 367 (Del. 1993) ("[W]e find the defendant directors, as a board, to have breached their duty of care by reaching an uninformed decision....").

**73.** Defs.' Ex. 20 (minutes of MFW special committee (June 21, 2011)); Defs.' Ex. 33 (Evercore engagement letter (June 22, 2011)).

**74.** Defs.' Ex. 16 (email to Evercore with HCHC and Mafco lending projections (June 27, 2011)).

ment's most up-to-date, and presumably most accurate, thinking.[75] Mafco, the licorice business, told Evercore that all of its projections would remain the same.[76] Harland Clarke updated its projections.[77] On July 22, Evercore received new projections from HCHC, which incorporated the updated projections from Harland Clarke, and Evercore constructed a valuation model based on them.[78]

The updated projections forecast EBITDA for MFW of $491 million in 2015, as opposed to $535 million under the original projections.[79] On August 10, Evercore produced a range of valuations for MFW, based on the updated projections, of $15 to $45 per share.[80] Evercore valued MFW using a variety of accepted methods, including a DCF model, which generated a range of fair value of $22 to $38 per share, and a premiums paid analysis, with a resulting value range of $22 to $45.[81] MacAndrews & Forbes's $24 offer fell within the range of values produced by each of Evercore's valuation techniques.[82]

The special committee asked Evercore to analyze how the possible sale of Har-

land to a rival check printing company might affect the valuation.[83] Evercore produced this analysis a week later, at the next meeting of the special committee, on August 17.[84] Evercore opined that such a sale would not produce a higher valuation for the company.[85] The special committee rejected the $24 proposal, and countered at $30 a share.[86] MacAndrews & Forbes was disappointed by this counteroffer.[87] On September 9, 2011, MacAndrews & Forbes rejected the special committee's $30 counteroffer, and reiterated its $24 offer.[88] Meister informed Schwartz that he would not recommend the $24 to the special committee.[89] Schwartz then obtained approval from Perelman to make a "best and final" offer of $25 a share.[90] At their eighth, and final, meeting, on September 10, 2011, Evercore opined that the price was fair, and the special committee unanimously decided to accept the offer.[91]

The MFW board then discussed the offer. Perelman, Schwartz, and Bevins, the three directors affiliated with MacAndrews & Forbes, and Dawson and Taub, the

75. Defs.' Ex. 22 (minutes of MFW special committee (July 13, 2011)); Defs.' Ex. 34 (email from Gus Christensen, Evercore, to Charles Dawson and Stephen Taub, MFW (July 15, 2011)).

76. Defs.' Ex. 38 (email from Gus Christensen to Paul Meister (July 18, 2011)).

77. Id.

78. Proxy 23.

79. Id. at 59–60.

80. Defs.' Ex. 45 (Evercore discussion materials (Aug. 10, 2011)).

81. Id.

82. Id.

83. Defs.' Ex. 24 (minutes of MFW special committee (Aug. 10, 2011)).

84. Defs.' Ex. 25 (minutes of MFW special committee (Aug. 17, 2011)); Defs.' Ex. 45 (Evercore discussion materials (Aug. 17, 2011)).

85. Defs.' Ex. 25.

86. Id.

87. Defs.' Ex. 26 (minutes of MFW special committee (Sept. 6, 2011)).

88. Defs.' Ex. 27 (minutes of MFW special committee (Sept. 10, 2011)).

89. Meister Dep. 160:3–9.

90. Schwartz Dep. 31:21–32:5.

91. Defs.' Ex. 27; Defs.' Ex. 32 (letter to the special committee from Evercore (Sept. 10, 2011)).

CEOs of HCHC and Mafco, recused themselves.[92] The remaining eight directors voted unanimously to recommend the offer to the stockholders.[93]

In their briefs, the plaintiffs make a number of arguments in which they question the business judgment of the special committee, in terms of issues such as whether the special committee could have extracted another higher bid from MacAndrews & Forbes if it had said no to the $25 per share offer, and whether the special committee was too conservative in valuing MFW's future prospects. These are the sorts of questions that can be asked about any business negotiation, and that are, of course, the core of an appraisal proceeding and relevant when a court has to make a determination itself about the financial fairness of a merger transaction under the entire fairness standard.

What is not in question is that the plaintiffs do not point to any evidence indicating that the independent members of the special committee did not meet their duty of care in evaluating, negotiating and ultimately agreeing to a merger at $25 per share. The record is clear that the special committee met frequently and was presented with a rich body of financial information relevant to whether and at what price a going private transaction was advisable, and thus there is no triable issue of fact as to its satisfaction of its duty of care.[94] Because the special committee was comprised entirely of independent directors, there is no basis to infer that they did not attempt in good faith to obtain the most favorable price they could secure for the minority or believe they had done so.

### F. A Fully Informed, Uncoerced Majority Of The Minority Votes To Support The Merger

On November 18, 2011, the stockholders were provided with a proxy statement containing the history of the merger and recommending that they vote in favor of the transaction. The proxy statement made clear, among other things, that the special committee had countered at $30 per share, but only was able to get a final offer of $25 per share.[95] The proxy statement indicated that the MFW business divisions discussed with Evercore whether the initial projections that Evercore received reflected management's latest thinking, and that plainly stated that the new projections were lower.[96] The proxy also gave the five separate ranges for the value of MFW's stock that Evercore had produced with different analyses.[97]

When the votes were counted on December 21, 2011, stockholders representing 65% of the shares not owned by MacAndrews & Forbes voted to accept the offer.[98] The merger closed that same day.[99]

Under settled authority, the uncoerced, fully informed vote of disinterested stockholders is entitled to substantial weight

---

92. Defs.' Ex. 51 (MFW board minutes (Sept. 11, 2011)).

93. *Id.*

94. *See Smith v. Van Gorkom*, 488 A.2d 858, 873 (Del.1985) ("In the specific context of a proposed merger of domestic corporations, a director has a duty ... to act in an informed and deliberate manner in determining whether to approve an agreement of merger before submitting the proposal to the stockholders.").

95. Proxy 24–25.

96. *Id.* at 23–24, 59–63.

97. *Id.* at 41–48.

98. Defs.' Br. in Supp. 23.

99. Defs.' Ex. 12 (M & F Worldwide Corp., Current Report (Form 8–K) (Dec. 22, 2011)).

under our law. Traditionally, such a vote on a third-party merger would, in itself, be sufficient to invoke the business judgment standard of review.[100] In the controlling stockholder merger context, it is settled that an uncoerced, informed majority-of-the-minority vote, without any other procedural protection, is itself sufficient to shift the burden of persuasion to the plaintiff under the entire fairness standard.[101]

Here, therefore, it is clear that as a matter of law, the majority-of-the-minority vote condition qualifies as a cleansing device under traditional Delaware corporate law principles. The consequences of these determinations for the resolution of this motion are important. Absent both of the procedural protections qualifying as a cleansing device, there would be no reason to answer the ultimate question the defendants pose, because that question depends on both of the protections having sufficient integrity to invoke the business judgment standard.

The court concludes here that there is no triable issue of fact regarding the operation of these devices. For the reasons stated, the plaintiffs themselves do not dispute that that majority-of-the-minority vote was fully informed and uncoerced, because they fail to allege any failure of disclosure or any act of coercion.

As to the special committee, the court has rejected the plaintiffs' challenge to the independence of the committee membership. The court also finds, as a matter of law, that there is no issue that the special committee was sufficiently empowered to hire its own advisors, inform itself, negotiate, and to definitively say no. Lastly, there is no triable issue of fact regarding whether the special committee fulfilled its duty of care.

These conditions are sufficient, under a traditional approach, to be effective in influencing the intensity of review, and as to a conflict transaction not involving a controlling stockholder, to invoke the business judgment rule standard of review.

**100.** *Smith v. Van Gorkom*, 488 A.2d 858, 890 (Del.1985) (stating that the "settled rule" was that if fully informed stockholders approved a transaction approved by even interested directors, the business judgment rule standard would be invoked, but that in the case of a third-party cash merger before the court, the stockholders' vote did not qualify because of disclosure inadequacies (citing *Gerlach v. Gillam*, 139 A.2d 591, 593 (Del.Ch.1958))). This rule has deep roots in the common law. *See, e.g., Cole v. Nat'l Cash Credit Ass'n*, 156 A. 183, 187 (Del.Ch.1931) ("As long as [the directors] act in good faith, with honest motives, for honest ends, the exercise of their discretion will not be interfered with.... The same presumption of fairness that supports the discretionary judgment of the managing directors must also be accorded to the majority of stockholders whenever they are called upon to speak for the corporation in matters assigned to them for decision, as is the case at one stage of the proceedings leading up to a sale of assets or a merger." (citation omitted)); *see also In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 736–38 (Del.Ch.1999)

(applying the rule in *Van Gorkom* to invoke the business judgment standard of review, and dismiss a claim that the directors of a corporation breached their duty of care in selling the corporation, where the stockholders were fully informed and voted to approve the deal); *Harbor Fin. P'rs v. Huizenga*, 751 A.2d 879, 890 (Del.Ch.1999) ("[T]he effect of untainted stockholder approval of the Merger is to invoke the protection of the business judgment rule and to insulate the Merger from all attacks other than on the ground of waste." (citation omitted)); *In re Wheelabrator Techs., Inc. S'holders Litig.*, 663 A.2d 1194, 1196 (Del.Ch.1995) (ruling that a fully informed, non-coercive stockholder vote on a merger extinguishes a duty of a care claim, and causes a duty of loyalty claim to be reviewed under the business judgment standard).

**101.** *Lynch I*, 638 A.2d at 1117; *see also Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840, 846 (Del.1987); *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 937 (Del.1985).

The court gives the committee such effect here. In doing so, the court eschews determining that the special committee was "effective" in a more colloquial sense. Although prior cases can potentially be read as requiring an assessment of whether a special committee was effective in the sense of being substantively good at its appointed task,[102] such a precondition is fundamentally inconsistent with the application of the business judgment rule standard of review. For a court to determine whether a special committee was effective in obtaining a good economic outcome involves the sort of second-guessing that the business judgment rule precludes. When a committee is structurally independent, has a sufficient mandate and cannot be bypassed, and fulfills its duty of care, it should be given standard-shifting effect. Any other approach as a matter of fact involves the application of a form of entire fairness review or at least the type of heightened reasonableness scrutiny required under the *Unocal* or *Revlon* standards, *i.e.*, standards that intentionally involve judges in reviewing director behavior in a manner not permitted under the business judgment rule.[103] Furthermore, adhering to this approach is consistent with a close reading of prior cases. In many of the cases where special committees were not given cleansing effect, the reason was not that the court second-guessed tactical decisions made by a con-

cededly independent committee with a sufficient mandate to protect the minority investors.[104] Rather, it was precisely because the special committee lacked one of these essential attributes that the committee was not given weight. For example, in *Lynch*, the committee's effectiveness was undermined because the controller made plain that if the committee did not consensually agree to a transaction, the controller would end-run the committee and go to the stockholders with a tender offer, a form of transaction that is generally considered intrinsically more coercive than one preceded by a merger vote.[105] Likewise, in *Tremont*, the committee was ineffective because two of the three directors breached their duty of care by "abdicat[ing] their responsibility" in favor of the chair, who had been lucratively employed as a consultant by the controller and did not come close to the standard of independence required of what was for practical purposes a one-person committee.[106]

To the extent that the fundamental rule is that a special committee should be given standard-influencing effect if it replicates arm's-length bargaining, that test is met if the committee is independent, can hire its own advisors, has a sufficient mandate to negotiate and the power to say no, and meets its duty of care. Under that approach, the MFW special committee qualifies.

102. See *Kahn v. Tremont Corp.*, 694 A.2d 422, 433–34 (Del.1997) (Quillen, J., concurring); see also *In re S. Peru Copper Corp.*, 52 A.3d 761, 790–91 (Del.Ch.2011), *aff'd sub nom. Ams. Mining Corp. v. Theriault*, 51 A.3d 1213 (Del.2012) (discussing *Tremont* ).

103. *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946 (Del.1985); *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173 (Del.1986).

104. *E.g., Tremont*, 694 A.2d at 429–30; *Lynch I*, 638 A.2d at 1118–19; see also *In re Loral*

*Space & Commc'ns Inc.*, 2008 WL 4293781, at *22–26 (Del.Ch. Sept. 19, 2008); *Gesoff v. IIC Indus. Inc.*, 902 A.2d 1130, 1150–52 (Del.Ch. 2006); *In re Tele-Commc'ns, Inc. S'holders Litig.*, 2005 WL 3642727, at *4–6 (Del.Ch. Jan. 10, 2006); *In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745, at *33 (Del.Ch. June 4, 2004).

105. *Lynch I*, 638 A.2d at 1118–19.

106. *Tremont Corp.*, 694 A.2d at 429–30.

## G. There Is No Triable Issue Of Fact That The Merger Was A Transaction That A Rational Person Could Believe Was Favorable To MFW's Minority Stockholders

■ If the business judgment rule standard of review applies, the claims against the defendants must be dismissed unless no rational person could have believed that the merger was favorable to MFW's minority stockholders.[107] Although the plaintiffs raise arguments as to why the merger should have been at a higher price, these arguments, and the scant facts supporting them, do not raise a triable issue of fact under the business judgment rule.[108] The merger was effected at a 47% premium to the closing price before MacAndrews & Forbes's offer. A financial advisor for the special committee found that the price was fair in light of various analyses, including a DCF analysis, which mirrors the valuation standard applicable in an appraisal case. MFW's businesses faced long-term challenges, particularly its check-printing business, Harland Clarke, which faced serious pricing pressure as its primary contract was put out to bid by the grantor and a seemingly irrevocable long-term decline in its industry because of global trends to eliminate as many checks as possible and conduct all transactions online. After disclosure of the material facts, 65% of the minority stockholders decided for themselves that the price was favorable.[109]

---

**107.** *E.g., In re Walt Disney Co. Deriv. Litig.,* 906 A.2d 27, 74 (Del.2006) ("[W]here business judgment presumptions are applicable, the board's decision will be upheld unless it cannot be 'attributed to any rational business purpose.'" (quoting *Sinclair Oil Corp. v. Levien,* 280 A.2d 717, 720 (Del.1971))); *Brehm v. Eisner,* 746 A.2d 244, 264 (Del.2000) ("We do not even decide if [directors' decisions] are *reasonable* in this context." (emphasis added)); *see generally* Stephen Bainbridge, *The Business Judgment Rule as Abstention Doctrine,* 57 Vand. L.Rev. 83 (2004) [hereinafter Bainbridge, *Abstention Doctrine* ].

**108.** The plaintiffs have not produced a valuation report by an expert opining that the merger price was unfair. The defendants make much of this, but, at oral argument, the plaintiffs explained that the defendants did not move for summary judgment on the fundamental issue of fairness. Oral Arg. Tr. 64:20–65:7. Rather, the motion and opening brief in support of the motion for summary judgment only argued that judgment in favor of the defendants should be granted because the effective special committee and the majority-of-the-minority vote invoked the business judgment rule standard of review, and the merger survived that standard as a matter of law; or, in the alternative and as a minimum, that the defendants were entitled to the benefit of a burden shift if the entire fairness standard applied. Although the defendants tried in their reply brief to broaden their motion to contend that there was no triable issue of fact regarding the substantive fairness of the merger, the plaintiffs are correct that this was procedurally unfair and improper. *See PharmAthene, Inc. v. SIGA Techs., Inc.,* 2011 WL 6392906, at *2 (Del.Ch. Dec. 16, 2011) ("[A] party waives any argument it fails properly to raise...."), *rev'd in part on other grounds,* 67 A.3d 330, 2013 WL 2303303 (Del. 2013).

Nonetheless, the plaintiffs knew that they needed to point to record facts supporting a triable issue of fact that the merger's terms constituted waste, such that they could not be terms that a rational fiduciary could accept in good faith. Oral Arg. Tr. 67:13–68:3.ˈ They have not come close to meeting that burden.

**109.** *See Harbor Fin. P'rs v. Huizenga,* 751 A.2d 879, 901 (Del.Ch.1999) ("[It is] logically difficult to conceptualize how a plaintiff can ultimately prove a waste or gift claim in the face of a decision by fully informed, uncoerced, independent stockholders to ratify the transaction. The test for waste is whether any person of ordinary sound business judgment could view the transaction as fair. If fully informed, uncoerced, independent stockholders have approved the transaction, they have ... made the decision that the transaction is a fair exchange.") (citing *Saxe v. Brady,* 184 A.2d 602, 611–12 (Del.Ch.1962) (observing that a stockholder vote approving of a transaction and authorizing future similar ones was "[s]urely ... some indication" that the transaction was reasonable)).

The plaintiffs' argument that many of these stockholders were arbitrageurs who had bought from longer-term stockholders and whose views should be discounted has a fundamental logical problem. The fact that long-term MFW stockholders sold at a price that was substantially higher than the market price when MacAndrews & Forbes made its offer but less than $25 per share merger price does not suggest that the price was one that long-term stockholders viewed as unfavorable. Rather, it suggests the opposite. The value of most stocks is highly debatable. What is not debatable here is that a rational mind could have believed the merger price fair, and that is what is relevant under the business judgment rule, which precludes judicial second-guessing when that is the case.

IV. *The Supreme Court Has Never Had A Chance To Answer The Question The Defendants Now Pose And Therefore It Remains Open For Consideration*

The next issue the court must determine is whether the question that the defendants pose has already been answered in a binding way by our Supreme Court. The defendants accurately argue, as will be explained, that the Supreme Court has never been asked to consider whether the business judgment rule applies if a controlling stockholder conditions the merger upfront on approval by an adequately empowered independent committee that acts with due care, and on the informed, uncoerced approval of a majority of the minority stockholders. To their credit, the plaintiffs admit that the defendants are correct in their argument that the Su-

preme Court has never been asked this question and that none of its prior decisions hinged on this question.[110]

But the plaintiffs, also accurately, note that there are broad statements in certain Supreme Court decisions that, if read literally and as binding holdings of law, say that the entire fairness standard applies to any merger with a controlling stockholder, regardless of the circumstances. In particular, the plaintiffs rely on language from the Supreme Court's decision in *Lynch,* which, they say, requires this court to review the MFW transaction under the entire fairness standard: "A controlling or dominating shareholder standing on both sides of a transaction, as in a parent-subsidiary context, bears the burden of proving its entire fairness."[111] The plaintiffs claim that this general principle controls this case. They then claim that our Supreme Court has affirmed this principle three times, in *Kahn v. Tremont Corp.,*[112] *Emerald Partners v. Berlin,*[113] and most recently in *Americas Mining Corp. v. Theriault.*[114]

■ There is no question that, if the Supreme Court has clearly spoken on a question of law necessary to deciding a case before it, this court must follow its answer. But, when the Supreme Court has not had a chance to answer the question in a case where the answer matters— or in this situation, a chance to answer the question at all—there is no answer for the trial courts to follow. As will be shown, our Supreme Court has never had the opportunity to decide what should be the correct standard of review in a situation like this, because it has never been presented with the question.

110. Oral Arg. Tr. 128:22–130:12.

111. *Lynch I,* 638 A.2d at 1115.

112. 694 A.2d 422 (Del.1997).

113. 726 A.2d 1215 (Del.1999).

114. 51 A.3d 1213 (Del.2012).

■ Our Supreme Court follows the traditional definition of "dictum," describing it as judicial statements on issues that "would have no effect on the outcome of [the] case."[115] In Delaware, such dictum is "without precedential effect."[116] Thus, broad judicial statements, when taken out of context, do not constitute binding holdings.[117] In addition, the Supreme Court treats as dictum language on an issue if the record before the court was "not sufficient to permit the question to be passed on."[118] If an issue is not presented to a court with the benefit of full argument and record, any statement on that issue by that court is not a holding with binding force.[119]

Both parties agree that no case has turned on the question of the effect of conditioning a merger upfront on the approval of a special committee and a majority of the noncontrolling stockholders. And, the parties agree that this issue has never been briefed or argued to a Delaware court. Therefore, under the Supreme Court's definition of dictum, the question in this case is still open.

The plaintiffs, although admitting that the question presented to the court here was never squarely presented to the Supreme Court, argue that three prior cases nonetheless preclude the application of any standard of review other than entire fairness. But, a close, if terse, discussion of them in chronological order shows that none of them constitutes binding precedent on the novel question now presented.

The plaintiffs rely most heavily on *Lynch* itself because of the broad statement previously quoted. There is a transactional similarity to the context here. The transaction that gave rise to the *Lynch* case was a merger between a parent corporation, Alcatel, and the subsidiary that it controlled, Lynch. Alcatel owned 43% of Lynch, and sought to obtain the rest of Lynch through a cash-out merger. And Lynch created a special committee to negotiate with Alcatel. But that is the critical point where the similarity ends.

In this case, MacAndrews & Forbes made two promises that were not made in *Lynch*. MacAndrews & Forbes said it would not proceed with any transaction unless the special committee approved it, and that it would subject any merger to a majority-of-the-minority vote condition.[120] In *Lynch*, the conduct was of a very differ-

**115.** *Brown v. United Water Del., Inc.*, 3 A.3d 272, 276 & n. 17 (Del.2010) (citation and internal quotation omitted); *see also Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 66–67, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996); *Black's Law Dictionary* (9th ed.2009).

**116.** *Crown EMAK P'rs, LLC v. Kurz*, 992 A.2d 377, 398 (Del.2010); *United Water*, 3 A.3d at 275.

**117.** *E.g.*, *Loudon v. Archer–Daniels–Midland Co.*, 700 A.2d 135, 142–43 (Del.1997) (describing as dictum language in *In re Tri–Star Pictures, Inc. Litig.*, 634 A.2d 319 (Del.1993), and ruling that it "should not be read to stand for any broader proposition" than the context permitted); *see also Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399–400, 5 L.Ed. 257 (1821) ("It is a maxim not to be disregarded, that general expressions, in every opinion, are

to be taken in connection with the case in which those expressions are used.").

**118.** *State ex rel. State Highway Dep't v. 9.88 Acres of Land*, 253 A.2d 509, 511 (Del.1969).

**119.** *E.g.*, *Gatz Props., LLC v. Auriga Capital Corp.*, 59 A.3d 1206, 1218 (Del.2012) (statements on issues "no[t] contested by the parties" are dictum) (internal quotation marks omitted); *see also Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 363, 126 S.Ct. 990, 163 L.Ed.2d 945 (2006) ("[W]e are not bound to follow our dicta in a prior case in which the point now at issue was not fully debated.") (citing *Cohens*, 19 U.S. (6 Wheat.) at 399–400).

**120.** Defs.' Ex. 18 (MacAndrews & Forbes proposal letter (June 13, 2011)).

ent and more troubling nature, in terms of the effectiveness of the special committee and the ability of the minority stockholders to protect themselves. Instead of committing not to bypass the special committee, Alcatel *threatened* to proceed with a hostile tender offer at a lower price if the special committee did not recommend the transaction to the board.[121] The special committee, which the Supreme Court perceived to be itself coerced by this threat, recommended the offer and signed up a merger agreement, and the stockholders voted in favor of the transaction.[122] A stockholder objected to the price paid, and brought an action for breach of fiduciary duty. The question of the equitable standard of review of the transaction was raised on appeal, and the Supreme Court stated: "Entire fairness remains the proper focus of judicial analysis in examining an interested merger, irrespective of whether the burden of proof remains upon or is shifted away from the controlling or dominating shareholder, because the unchanging nature of the underlying 'interested' transaction requires careful scrutiny." [123] This language, the plaintiffs say, dictates the standard of review to be applied to this case.

But, as indicated, the situation in *Lynch* was very different from the transaction in this case. The *Lynch* merger was conditioned only on the approval of the special committee, *not* on the approval of the non-Alcatel stockholders as well. Furthermore, the special committee in *Lynch* was not empowered to say no, because Alcatel reserved the right to and did in fact threaten to approach the stockholders with a tender offer at a lower price. The Lynch CEO testified that one Alcatel representative on the Lynch board "scared [the non-Alcatel directors] to death," and one of the three directors on the special committee testified that he thought that the price paid was unfair.[124] In this case, by contrast, there is no dispute that the special committee did have the power to say no to the transaction. And, unlike in *Lynch*, the transaction in this case was conditioned upfront on the approval of both the special committee and the majority of the noncontrolling stockholders; in *Lynch*, by contrast, the transaction was conditioned on neither.

Moreover, as the defendants point out, even if the special committee in *Lynch* was entitled to credit for purposes of establishing the standard of review or the burden of proof within a standard of review, the Supreme Court was only asked to determine what the standard of review was when a merger was approved by a special committee, not by a special committee *and* a non-waivable majority-of-the-minority vote. Thus, the defendants accurately point out that the binding holding of *Lynch* is narrower and consists in this key statement from the decision: "[E]ven when an interested cash-out merger transaction receives the informed approval of a majority of minority stockholders *or* an independent committee of disinterested directors, an entire fairness analysis is the only proper standard of judicial review." [125] The plaintiffs might wish the disciplined use of "or" by our Supreme Court was inadvertent, but this court does not believe that was the case.

121. *Lynch I*, 638 A.2d at 1120–21.

122. *Kahn v. Lynch Commc'n Sys.*, 669 A.2d 79, 89 (Del.1995).

123. *Lynch I*, 638 A.2d at 1116.

124. *Id.* at 1114, 1118 (quoting *Kahn v. Lynch Commc'n Sys.*, 1993 WL 290193, at *789 (Del. Ch. July 9, 1993)).

125. *Id.* at 1117 (emphasis added); Oral Arg. Tr. 16:14–19.

Neither of the decisions succeeding *Lynch* that the plaintiffs rely upon speaks to the question presented here.[126] For example, *Kahn v. Tremont* was a derivative suit in which this court evaluated whether a corporation, Tremont, had overpaid for stock owned by its controlling stockholder.[127] As in *Lynch*, Tremont formed a special committee of three independent directors to determine whether it should carry out the purchase, and the committee approved the transaction.[128] As in *Lynch*, the transaction was not conditioned on the approval of the minority stockholders. As in *Lynch*, the Supreme Court held that the entire fairness standard would apply because it was an interested transaction involving a controlling stockholder, and that the special committee's role would at most serve to shift the burden of persuasion on the ultimate question of fairness.[129] As in *Lynch*, the Supreme Court viewed there to be serious issues regarding whether the special committee should be given even burden-shifting credit because two of the directors abdicated their duties, and the third had been a well-paid consultant to one of the controlling stockholder's companies.[130] Thus, unlike this case, both of the procedural protections were not used. Unlike this case, the independence of the special

committee was in doubt. As with *Lynch*, therefore, *Tremont* did not present our Supreme Court with any occasion to speak to whether the use of both a properly empowered, careful, and independent special committee and a non-waivable condition that an informed, uncoerced majority of the minority approve the transaction would invoke the business judgment rule standard. Because of this, the broad language in *Tremont* that suggests that whenever a controlling stockholder stands on both sides of a transaction, entire fairness is the correct standard of review, does not, in the court's view, decide this case.[131]

The third case the plaintiffs quote is *Southern Peru*.[132] In *Southern Peru*, the Supreme Court affirmed this court's finding that a merger with a controlling stockholder was not entirely fair to the noncontrolling stockholders. The Supreme Court discussed at what point the burden of proof should shift in a transaction with a controlling stockholder, and, in that context, stated: "When a transaction involving self-dealing by a controlling shareholder is challenged, the applicable standard of judicial review is entire fairness, with the defendants having the burden of persuasion."[133] But it did so in a case where the

126. The plaintiffs do not rely upon *Emerald Partners v. Berlin*, except to note that in that case, the Supreme Court upheld the application of the entire fairness standard to a merger between a Delaware corporation and other corporations owned by the same controlling stockholder. 726 A.2d 1215 (Del.1999); Pls.' Br. in Opp'n 40. The plaintiffs quote no language from that case, and it did not present the question posed now.

127. *See Kahn v. Tremont Corp.*, 694 A.2d 422 (Del.1997).

128. *Id.* at 426.

129. *Id.* at 428–29.

130. *Id.* at 429–30.

131. The plaintiffs do not rely on the actual holding of the court necessary to address the precise issues raised in *Tremont*, but instead quote this sentence: "Regardless of where the burden lies, when a controlling shareholder stands on both sides of the transaction the conduct of the parties will be viewed under the more exacting standard of entire fairness as opposed to the more deferential business judgment standard." *Id.* at 428.

132. *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213 (Del.2012).

133. *Id.* at 1239.

defendants had expressly eschewed any argument that any standard of review other than entire fairness applied.[134] Given that concession, there was no need to address the question now presented and no answer was given by this court or the Supreme Court in that case.

Admittedly, there is broad language in each of these decisions, and in some other cases, that can be read to control the question asked in this case.[135] But this, like all judicial language, needs to be read in full context, as our Supreme Court itself has emphasized.[136] Of course, the ultimate authority regarding the Supreme Court's prior decisions, and whether they constitute a binding holding that the employment of two potent procedural protections on behalf of the minority has no greater effect than employing one of those, is the Supreme Court itself. If this court is incorrect and the Supreme Court believes that it has answered this question in the prior cases, it will doubtless say so. But, given that no prior case's outcome turned on that issue, and no prior case involved any party who asked the question now posed, this court concludes that under traditional jurisprudential principles, the

question remains an open one for this court to address in the first instance.[137]

That conclusion, of course, does not mean that the decisions dealing with similar contexts have no relevance.[138] To the contrary, this court must and will give heavy consideration to the reasoning of our Supreme Court's prior decisions. In particular, the prior cases make emphatic the strong public policy interest our common law of corporations has in the fair treatment of minority stockholders and the need to ensure that controlling stockholders do not extract unfair rents using their influence. Fidelity to not just *Lynch,* but cases like *Weinberger,* requires that the question before the court receive an answer that gives that public policy interest heavy weight.[139] With that in mind, the court turns to the task of answering the question posed now.

### V. *The Business Judgment Rule Governs And Summary Judgment Is Granted*

■ This case thus presents, for the first time, the question of what should be the correct standard of review for mergers between a controlling stockholder and its subsidiary, when the merger is conditioned

---

134. *In re S. Peru Copper Corp. S'holder Litig.,* 52 A.3d 761, 766 (Del.Ch.2011) ("The parties agree that the appropriate standard of review is entire fairness.").

135. *E.g., Weinberger v. UOP, Inc.,* 457 A.2d 701, 710 (Del.1983) ("The requirement of fairness is unflinching in its demand that where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts.").

136. *See, e.g., Sternberg v. O'Neil,* 550 A.2d 1105, 1116 (Del.1988) (noting that statements from *Shaffer v. Heitner,* 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), must be "read in context"); *Rabkin v. Philip A. Hunt Chem. Corp.,* 498 A.2d 1099, 1104 (Del.1985) (holding that it is necessary "to take account of the

entire context" of *Weinberger,* 457 A.2d 701, when determining remedies in a cash-out merger).

137. *See In re CNX Gas Corp. S'holders Litig.,* 4 A.3d 397 (Del.Ch.2010) (reviewing cases, and concluding that the question of the standard of review is an open one).

138. *See, e.g., Hoffman Plastic Compounds, Inc. v. NLRB,* 535 U.S. 137, 147, 122 S.Ct. 1275, 152 L.Ed.2d 271 (2002) (noting that even "isolated sentences" may be considered "persuasive authority"); *Bata v. Bata,* 163 A.2d 493, 510 (Del.1960) (finding dictum "none the less persuasive").

139. *Lynch I,* 638 A.2d 1110; *Weinberger,* 457 A.2d 701.

on the approval of both an independent, adequately empowered special committee that fulfills its duty of care, and the uncoerced, informed vote of a majority of the minority stockholders.

In prior cases, this court has outlined the development of the case law in this area,[140] as have distinguished scholars,[141] and there is no need to repeat that recitation. The core legal question is framed by the parties' contending positions. For their part, the defendants say that it would be beneficial systemically to minority stockholders to review transactions structured with both procedural protections under the business judgment rule. Absent an incentive to do so, the defendants argue that controlling stockholders will not agree upfront to both protections, thus denying minority stockholders access to the transaction structure most protective of their interests—one that gives them the benefit of an active and empowered bargaining agent to negotiate price and to say no, plus the ability to freely decide for themselves on full information whether to accept any deal approved by that agent. This structure is not common now because controlling stockholders have no incentive under the law to agree to it, and such an incentive is needed because it involves the controller ceding potent power to the independent directors and minority stockholders.[142] The defendants argue that the benefits of their preferred approach are considerable, and that the costs are negligible because there is little utility to having an expensive, judicially intensive standard of review when stockholders can protect themselves by voting no if they do not like the recommendation of a fully empowered independent committee that exercised due care. In support of that argument, the defendants can cite to empirical evidence showing that the absence of a legally recognized transaction structure that can invoke the business judgment rule standard of review has resulted not in litigation that generates tangible positive results for minority stockholders in the form of additional money in their pockets, but in litigation that is settled for fees because there is no practical way of getting the case dismissed at the pleading stage and the costs of discovery and entanglement in multiyear litigation exceed the costs of paying attorneys' fees.[143] Finally, the defendants note that Delaware law on controlling stockholder going private transactions is now inconsistent, with the intrinsically more coercive route of using a tender offer to accomplish a going private transaction escaping the full force of equitable review, when a similarly structured merger where a less coercive chance to say no exists would not.[144]

---

**140.** *E.g., In re Pure Res., Inc., S'holders Litig.,* 808 A.2d 421 (Del.Ch.2002); *In re Cysive, Inc. S'holders Litig.,* 836 A.2d 531 (Del.Ch.2003); *In re Cox Commc'ns, Inc. S'holders Litig.,* 879 A.2d 604 (Del.Ch.2005); *CNX,* 4 A.3d 397; *see also* Allen et al., *Function over Form,* at 1306–09; Leo E. Strine, Jr., *The Inescapably Empirical Foundation of the Common Law of Corporations,* 27 Del. J. Corp. L. 499, 506–13 (2002).

**141.** *E.g.,* Gilson & Gordon, *Controlling Shareholders,* at 796–803, 805–27; Subramanian, *Fixing Freezeouts,* at 11–22.

**142.** *See, e.g.,* Subramanian, *Fixing Freezeouts,* at 59.

**143.** *See generally* Elliott J. Weiss & Lawrence J. White, *File Early, Then Free Ride: How Delaware Law (Mis)Shapes Shareholder Class Actions,* 57 Vand. L.Rev. 1797 (2004) [hereinafter Weiss & White, *File Early* ]; *see also Cox,* 879 A.2d at 613–14 (discussing Weiss & White, *File Early* ); Aff. of Lawrence J. White, *Cox,* C.A. No. 613–N (Del. Ch. Jan. 13, 2005) (summarizing Weiss & White, *File Early* ).

**144.** *Compare In re Siliconix Inc. S'holders Litig.,* 2001 WL 716787 (Del.Ch. June 21, 2001), *with Lynch I,* 638 A.2d 1110. The implication of the Supreme Court's decision in *Solomon v. Pathe* and cases following it, such as *Siliconix,* is that a going private transaction pro-

In response, the plaintiffs argue that a requirement that every controlling stockholder transaction be subject to fairness review is good for minority stockholders. The plaintiffs, rather surprisingly, argue that giving stockholders the protection of a majority-of-the-minority vote in addition to a special committee adds little value because, in their view, stockholders will always vote for a good premium deal, and long-term stockholders will sell out to arbitrageurs in advance of the vote, leaving the minority vote in the hands of stockholders who will invariably vote for the deal.[145] That said, the plaintiffs conceded in their briefing that minority stockholders would benefit if more controlling stockholders would use a structure that gave minority stockholders an independent bargaining and veto agent as well as a majority-of-the-minority vote.[146] But they contend that the cost of not having an invariable judicial inquiry into fairness outweighs that benefit.

After considering these arguments, the court concludes that the rule of equitable common law that best protects minority investors is one that encourages controlling stockholders to accord the minority this potent combination of procedural protections.

There are several reasons for this conclusion. The court begins with a Delaware tradition. Under Delaware law, it has long been thought beneficial to investors for courts, which are not experts in business, to defer to the disinterested decisions of directors, who are expert, and stockholders, whose money is at stake.[147] Thus, when no fiduciary has a personal self-interest adverse to that of the company and its other stockholders, the fiduciary is well-informed, and there is no statutory requirement for a vote, the business judgment rule standard of review applies and precludes judicial second-guessing so long as the board's decision "can be attributed to any rational business purpose."[148] Out-

posed by a controller by the tender offer method is not subject to equitable review. *Solomon v. Pathe Commc'ns Corp.*, 672 A.2d 35 (1996). Although this implication has been affected by later cases such *Pure* and *Cox*, it remains the case that it is not certain that a controlling stockholder owes the same equitable obligations when it seeks to acquire the rest of a corporation's equity by a tender offer, rather than by a statutory merger. *See* Gilson & Gordon, *Controlling Shareholders*, at 796–832; Subramanian, *Fixing Freezeouts*, at 11–22.

145. Oral Arg. Tr. 80:12–18.

146. Pls.' Br. in Opp'n 46.

147. *E.g., Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 205 (Del.Ch. 2006), *aff'd*, 931 A.2d 438 (Del.2007) (TABLE) (describing the business judgment rule as being designed to "provid[e] directors with sufficient insulation so that they can seek to create wealth through the good faith pursuit of business strategies that involve a risk of

failure"); *Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1052 (Del.Ch.1996) ("[The business judgment rule] *protects shareholder investment interests* against the uneconomic consequences that the presence of judicial second-guessing risk would have on director action and shareholder wealth in a number of ways."); Bainbridge, *Abstention Doctrine*, at 110 (describing part of the role of the business judgment rule as "encouraging optimal risk taking").

148. *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del.1971); *see Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del.1993) ("To rebut the [business judgment] rule, a shareholder plaintiff assumes the burden of providing evidence that directors, in reaching their challenged decision, breached [the duties of] loyalty or due care. If a shareholder plaintiff fails to meet this evidentiary burden, the business judgment rule attaches to protect corporate officers and directors and the decisions they make, and our courts will not second-guess these business judgments." (citations omitted)).

side the controlling stockholder merger context, it has long been the law that even when a transaction is an interested one but not requiring a stockholder vote, Delaware law has invoked the protections of the business judgment rule when the transaction was approved by disinterested directors acting with due care.[149]

This tradition of respecting the value of impartial decisionmaking by disinterested fiduciaries was maintained even when Delaware confronted the takeover boom that started in the late 1970s. The innovative standards that emerged in *Unocal* and *Revlon* required more judicially intensive review, but gave heavy credit for empowering the independent elements of the board.[150] And when arm's-length cash mergers were approved by fully informed, uncoerced votes of the disinterested stockholders, the business judgment rule standard of review was applied to any class-action claim for monetary relief based on the inadequacy of the merger price.[151]

But tradition should admittedly not persist if it lacks current value.[152] If providing an incentive for a disinterested bargaining agent and a disinterested approval vote are of no utility to minority investors, it would not make sense to shape a rule that encourages their use.

But even the plaintiffs here admit that this transactional structure is the optimal one for minority stockholders.[153] They just claim that there is some magical way to have it spread that involves no cost.[154] That is not so, however. Absent doing

149. *E.g., Beard v. Elster*, 160 A.2d 731, 737 (Del.1960) ("Implicit in the [court's decision in *Gottlieb v. Heyden Chemical Corp.*, 90 A.2d 660 (Del.1952), not to grant business judgment review to a board's decision to approve a stock option plan] is, of course, that a different situation would have presented itself had the Board of Directors been in fact disinterested. It follows that in such cases the sound business judgment rule might well have come to the aid of the proponents of the plan."); *Blish v. Thompson Automatic Arms Corp.*, 64 A.2d 581, 603 (Del.1948) (finding that disinterested directors had the power to approve a grant of stock to other directors, and that, "in the absence of fraud, ... their unanimous action [was] final"); *Puma v. Marriott*, 283 A.2d 693, 696 (Del.Ch.1971) ("[S]ince the transaction complained of was accomplished as a result of the exercise of independent business judgment of the outside, independent directors whose sole interest was the furtherance of the corporate enterprise, the court is precluded from substituting its uninformed opinion for that of the experienced, independent board members....").

150. *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 955 (Del.1985) (holding that as part of a new standard of review requiring directors taking defensive actions to show that those actions were reasonable in relation to threat posed, "such proof is materially enhanced ... by the approval of a board comprised of a majority of outside independent directors" (citations omitted)); *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 176 n. 3 (Del.1986) (noting that the Revlon board was not "entitled to certain presumptions that generally attach to the decisions of a board whose majority consists of truly outside independent directors").

151. *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 736–38 (Del.Ch.1999); *Harbor Fin. P'rs v. Huizenga*, 751 A.2d 879, 890 (Del.Ch. 1999); *In re Wheelabrator Techs., Inc. S'holders Litig.*, 663 A.2d 1194, 1205 (Del.Ch.1995); *see also Smith v. Van Gorkom*, 488 A.2d 858, 890 (Del.1985).

152. The Supreme Court has noted the wisdom of not following a rule simply because it was "laid down in the time of Henry IV." *Keeler v. Harford Mut. Ins. Co.*, 672 A.2d 1012, 1017 n. 6 (Del.1996) (quoting Oliver Wendell Holmes, *The Path of the Law*, 10 Harv. L.Rev. 457, 469 (1897)).

153. Pls.' Br. in Opp'n 46; *see also* Oral Arg. Tr. 102:13–18 (plaintiffs' counsel acknowledging that majority-of-the-minority conditions have been used to block going private transactions).

154. Oral Arg. Tr. 80:2–4.

something that is in fact inconsistent with binding precedent—requiring controlling stockholders to use both protections in order to get *any* credit under the entire fairness standard—there is no way to create an incentive for the use of both protections other than to give controllers who grant both protections to the minority the benefit of business judgment rule review.

A choice about our common law of corporations must therefore be made, and the court is persuaded that what is optimal for the protection of stockholders and the creation of wealth through the corporate form is adopting a form of the rule the defendants advocate. By giving controlling stockholders the opportunity to have a going private transaction reviewed under the business judgment rule, a strong incentive is created to give minority stockholders much broader access to the transactional structure that is most likely to effectively protect their interests. In fact, this incentive may make this structure the common one, which would be highly beneficial to minority stockholders. That structure, it is important to note, is critically different than a structure that uses only *one* of the procedural protections. The "or" structure does not replicate the protections of a third-party merger under the DGCL approval process, because it only requires that one, and not both, of the statutory requirements of director and stockholder approval be accomplished by impartial decisionmakers.[155] The "both" structure, by contrast, replicates the arm's-length merger steps of the DGCL by "requir[ing] two

independent approvals, which it is fair to say serve independent integrity-enforcing functions." [156]

When these two protections are established up-front, a potent tool to extract good value for the minority is established. From inception, the controlling stockholder knows that it cannot bypass the special committee's ability to say no. And, the controlling stockholder knows it cannot dangle a majority-of-the-minority vote before the special committee late in the process as a deal-closer rather than having to make a price move. From inception, the controller has had to accept that any deal agreed to by the special committee will also have to be supported by a majority of the minority stockholders. That understanding also affects the incentives of the special committee in an important way. The special committee will understand that those for whom it is bargaining will get a chance to express whether they think the special committee did a good or poor job. Although it is possible that there are independent directors who have little regard for their duties or for being perceived by their company's stockholders (and the larger network of institutional investors) as being effective at protecting public stockholders, the court thinks they are likely to be exceptional, and certainly our Supreme Court's jurisprudence does not embrace such a skeptical view.[157] The Supreme Court has held that independent directors are presumed to be motivated to do their duty with fidelity, like most other

---

**155.** 8 *Del. C.* § 251(b)-(c) (requiring that mergers be approved by the board of directors and the stockholders of each merging corporation).

**156.** *In re Cox Commc'ns, Inc. S'holders Litig.*, 879 A.2d 604, 618 (Del.Ch.2005).

**157.** *See, e.g., Aronson v. Lewis*, 473 A.2d 805, 814–15 (Del.1984) (holding that independent

directors can be entrusted with the decision to sue other directors on behalf of the corporation); *Weinberger v. UOP, Inc.*, 457 A.2d 701, 709 n. 7 (Del.1983) ("[T]he result here could have been entirely different if UOP had appointed an independent negotiating committee of its outside directors to deal with Signal at arm's length.").

people,[158] and has also observed that directors have a more self-protective interest in retaining their reputations as faithful, diligent fiduciaries.[159] The requirement that a majority of the minority approve the special committee's recommendation enhances both motivations, because most directors will want to procure a deal that their minority stockholders think is a favorable one, and virtually all will not want to suffer the reputational embarrassment of repudiation at the ballot box.[160] That is especially so in a market where many independent directors serve on several boards, and where institutional investors and their voting advisors, such as ISS and Glass Lewis, have computer-aided memory banks available to remind them of the past record of directors when considering whether to vote for them or withhold votes at annual meetings of companies on whose boards they serve.[161]

The premise that independent directors with the right incentives can play an effective role on behalf of minority investors is one shared by respected scholars sincerely concerned with protecting minority inves-

158. *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048 (Del.2004) ("[D]irectors are entitled to a *presumption* that they were faithful to their fiduciary duties." (citing *Aronson*, 473 A.2d at 812)).

159. *Id.* at 1052 ("To create a reasonable doubt about an outside director's independence, a plaintiff must plead facts that would support the inference that ... the non-interested director would be more willing to risk his or her reputation than risk the relationship with the interested director." (citation omitted)).

160. A 2006 amendment to the DGCL provides that stockholders may, by bylaw, specify "the votes that shall be necessary for the election of directors." 75 Del. Laws ch. 306, § 5 (2006) (amending 8 *Del. C.* § 216). Majority voting provisions, allowing stockholders to run withhold vote campaigns and unseat particular directors, have become standard in recent years, especially in large companies. Marcel Kahan & Edward Rock, *The Insignificance of Proxy Access*, 97 Va. L.Rev. 1347, 1359–60 (2011) [hereinafter Kahan & Rock, *Proxy Access* ]; Claudia H. Allen, *Study of Majority Voting in Director Elections* (Nov. 12, 2007), http://www.ngelaw.com/files/Uploads/Documents/majoritystudy111207.pdf. Professors Kahan and Rock analyzed majority withhold votes at Russell 3000 companies in 2008 and 2009. They found that, of the companies whose directors did not leave the board within one year of a majority withhold vote and that were not acquired in that time, two-thirds addressed the issues motivating the withhold vote to the satisfaction of stockhold-ers, and large companies were particularly responsive. Kahan & Rock, *Proxy Access*, at 1420–22; *see also 2012 Proxy Season Review: World Markets*, Inst. S'holder Servs. (Feb. 27, 2013), at 178–85, http://www. issgovernance.com/files/private/2012 CombinedPostseasonReport.pdf (detailing the increased use of proxy contests and withhold campaigns in recent years, and the ability of activist investors to not only prevail at the actual ballot box in contested situations, but to use the threat of a proxy contest or withhold campaign as a successful method to procure changes in corporate strategy and board composition, even at large cap companies).

161. *E.g., Proxy Paper Guidelines: 2013 Proxy Season*, Glass Lewis & Co. (2012), at 1, http:// www.glasslewis.com/assets/uploads/2012/02/ Guidelines_UnitedStates_2013_Abridged.pdf ("[W]hen assessing the independence of directors we will also examine when a director's service track record on multiple boards indicates a lack of objective decision-making."); *2012–2013 Policy Survey Summary of Results*, Inst. S'holder Servs. (Jan. 31, 2013), at 3, http://www.issgovernance. com/files/private/ISSPolicySurveyResults 2012.pdf (reporting that 61% of ISS survey respondents stated that a director's track record on other boards was "very important" in voting for a new board nominee); *2013 U.S. Proxy Voting Summary Guidelines*, Inst. S'holder Servs. § 2.1.19 (Jan. 31, 2013), http://www.issgovernance.com/files/2013 ISSUSSummaryGuidelines1312013.pdf (providing for a withhold vote recommendation on account of "[e]gregious actions related to a director's service on other boards").

tors from unfair treatment by controlling stockholders. Their scholarship and empirical evidence indicates that special committees have played a valuable role in generating outcomes for minority investors in going private transactions that compare favorably with the premiums received in third-party merger transactions.[162]

But, like these scholars, the court is aware that even impartial directors acting in good faith and with due care can sometimes come out with an outcome that minority investors themselves do not find favorable. Conditioning the going private transaction's consummation on a majority-of-the-minority vote deals with this problem in two important and distinct ways. The first was just described. Because a special committee in this structure knows from the get-go that its work will be subject to disapproval by the minority stockholders, the special committee has a strong incentive to get a deal that will gain their approval. And, critically, so does another key party: the controlling stockholder itself, which will want to close the deal, having sunk substantial costs into the process.

But the second is equally important. If, despite these incentives, the special committee approves a transaction that the minority investors do not like, the minority investors get to vote it down, on a full information base and without coercion. In the *Unitrin* case nearly a generation ago, our Supreme Court noted the prevalence of institutional investors in the target company's stockholder base in concluding that a proxy contest centering on the price of a takeover offer was viable, despite insiders having increased their stock ownership to 28%, stating that "[i]nstitutions are more likely than other shareholders to vote at all [and] more likely to vote against manager proposals."[163] Market developments in the score of years since have made it far easier, not harder, for stockholders to protect themselves. With the development of the internet, there is more public information than ever about various commentators', analysts', institutional investors', journalists' and others' views about the wisdom of transactions. Likewise, the internet facilitates campaigns to defeat management recommendations. Not only that, institutional investor holdings have only grown since 1994, making it easier for a blocking position of minority investors to be assembled.[164] Perhaps most important, it is difficult to look at the past generation of experience and conclude that stockholders are reluctant to express positions contrary to those espoused by company management. Stockholders have been effective in using their voting rights to adopt precatory proposals that have re-

---

162. *See, e.g.,* Guhan Subramanian, *Post–Siliconix Freeze–Outs: Theory and Evidence,* 36 J. Legal Stud. 1, 13 tbl. 1 (2007) [hereinafter, Subramanian, *Post–*Siliconix] (reporting long-term cumulative abnormal returns of 39% in completed going private transactions between 2001 and 2005, almost all of which used a special committee).

163. *Unitrin, Inc. v. Am. Gen. Corp.,* 651 A.2d 1361, 1382 (Del.1995) (citation and internal quotation marks omitted).

164. *See, e.g.,* Marshall E. Blume & Donald B. Keim, *Institutional Investors and Stock Market Liquidity: Trends and Relationships* (Aug. 21, 2012), at 4, http://www.wharton.upenn.edu/jacobslevycenter/files/14.12.Keim.pdf (showing that institutional investors by the end of 2010 held 67% of equities, compared with only about 5% in 1945); Matteo Tonello & Stephan Rabimov, *The 2010 Institutional Investment Report: Trends In Asset Allocation and Portfolio Composition,* Conference Bd. (2009), at 26, http://www.conferenceboard.org/retrievefile. cfm?filename=Institutional%20Investment%20Report.pdf&type=subsite (showing that institutional ownership of equities in the 1,000 largest U.S. companies increased from 57% in 1994 to 69% in 2008).

sulted in a sharp increase in so-called majority voting policies and a sharp decrease in structural takeover defenses.[165] Stockholders have mounted more proxy fights, and, as important, wielded the threat of a proxy fight or a "withhold vote" campaign to secure changes in both corporate policies and the composition of corporate boards.[166] Stockholders have voted against mergers they did not find favorable, or forced increases in price.[167] Nor

has timidity characterized stockholder behavior in companies with large blockholders or even majority stockholders; such companies still face stockholder activism in various forms, and are frequently the subject of lawsuits if stockholders suspect wrongdoing.[168]

■ As our Supreme Court has recognized more than once, the application of fiduciary duty principles must be influenced by current corporate practices.[169]

165. *See, e.g., 2012 Report,* S'holder Rights Project, http://srp.law.harvard.edu/releases/SRP–2012–Annual–Report.pdf (noting that, from the beginning of 1999 to the beginning of 2012, the number of S & P 500 companies with staggered boards declined from 303 to 126, and that over 40 of these 126 companies declassified their boards in 2012 alone); Andrew L. Bab & Sean P. Neenan, *Poison Pills in 2011,* Conference Bd. (Dec.2011), at 2, http://www.conference-board.org/retrievefile.cfm?filename=TCB%20DN–V3N5–11.pdf & type=subsite (finding that, between 2001 and 2011, the number of companies with poison pills declined from 2,200 to 900).

166. Kahan & Rock, *Proxy Access,* at 1420–25; *accord* Diane Del Guercio et al., *Do Boards Pay Attention When Investor Activists "Just Vote No"?,* 90 J. Fin. Econ. 84 (2008) (noting that withhold campaigns have become more frequent over time, and finding that withhold campaigns with 20% or more support often result in the board implementing all specific requests made by stockholders).

167. A non-exclusive sampling from this court's own memory provides many examples of transactions that have been voted down, or come close to being voted down, by the stockholders. In 2007, stockholders voted down Carl Icahn's buyout of Lear Group, after this court issued a limited preliminary injunction requiring further disclosures. *In re Lear Corp. S'holder Litig.,* 967 A.2d 640, 641 (Del. Ch.2008). Again in 2007, stockholders in Inter–Tel threatened to vote down a merger with Mitel on the ground that the price was inadequate, forcing the stockholder vote to be delayed, until it appeared from new information about the capital markets that the Mitel offer was a good one. *Mercier v. Inter–Tel. (Del.), Inc.,* 929 A.2d 786 (Del.Ch.2007). In 2010, the stockholders of Dollar Thrifty voted

down a merger with Hertz, only to accept a higher offer from Hertz two years later. Michael J. De La Merced & Peter Lattman, *After Long Pursuit, Hertz To Buy Dollar Thrifty for $2.3 Billion,* N.Y. Times, Aug. 26, 2012, http://dealbook.nytimes.com/2012/08/26/hertz-on-the-verge-ofbuying-dollar-thrifty; *see In re Dollar Thrifty S'holder Litig.,* 14 A.3d 573 (Del.Ch.2010) (denying a motion to preliminarily enjoin the 2010 stockholder vote).

In fact, as this decision was being finalized, the telecommunications company Sprint was attempting to cash out the minority stockholders in Clearwire as part of its own sale to Softbank. The press reported that, faced with considerable opposition by the minority, Sprint raised its offer from $2.97 per share to $3.40, and delayed the vote on the transaction. Sinead Carew, *Clearwire, Shareholders Brace for Fight over Sprint Bid* (May 22, 2013), http://www.reuters.com/article/2013/05/22/usclearwire-sprint-idUSBRE94K0JY20130522.

168. For example, the minority Class A stockholders of Revlon, another Perelman-controlled corporation, twice rejected an exchange offer by Revlon that was premised on a non-waivable majority-of-the-minority condition. *In re Revlon, Inc. S'holders. Litig.,* 990 A.2d 940, 950–51 (Del.Ch.2010). As a further example, in 2007, Cablevision stockholders rejected the controller's (the Dolan family) $10.6 billion buyout. Andrew Ross Sorkin, *Dolans' Bid To Take Cablevision Private Is Rejected by Shareholders,* N.Y. Times, Oct. 25, 2007, http://www.nytimes.com/2007/10/25/business/media/25cable.html.

169. *Moran v. Household Int'l, Inc.,* 500 A.2d 1346, 1351 (Del.1985) ("[O]ur corporate law is not static. It must grow and develop in

Given the evident and growing power of modern stockholders, there seems to be little basis to doubt the fairness-assuring effectiveness of an upfront majority-of-the-minority vote condition when that condition is combined, as it was here, by a promise that the controller would not proceed with a transaction without both the approval of the special committee and the approval of a majority of the minority. Although one of the rationales identified in *Lynch* for fairness review of a going private merger with only one of the protections was that minority stockholders might be too afraid in any circumstance to vote freely, that rationale was one advanced in the context of a deal structure where the minority was expressly faced with a situation where a controller informed the special committee that it would put a lower priced offer directly to the stockholders in the intrinsically more coercive form of a tender offer.[170] One of the things two very distinguished but very different corporate governance experts—Lucian Bebchuk and Marty Lipton—agree upon is that a tender offer, particularly one where there is the possibility that a non-tendering stockholder will be left as part of a stub minority or receive an even lower value than if she tenders, is intrinsically more coercive than a merger vote where a stockholder can vote no and still get the merger consideration if the other stockholders vote in sufficient numbers to approve the deal.[171] The "both" structure limits coercion like this because the controller cannot end run the special committee in this way, and thus addresses the rationale advanced in *Lynch.*

So does another element of the structure. *Lynch* suggested that minority stockholders might be inhibited from voting freely because the controller could engage in retribution. The upfront promise not to bypass the special committee or the majority-of-the-minority condition limits the potential for any retributive going private effort. A controller who violated this promise would face withering scrutiny from stockholders. As important, the past generation has demonstrated, time and again, the willingness of the Delaware Supreme Court to uphold strong medicine against violations of the duty of loyalty,[172]

---

response to, indeed in anticipation of, evolving concepts and needs." (quoting *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 957 (Del.1985))); *see also* Jack B. Jacobs, *Does the New Corporate Shareholder Profile Call for a New Corporate Law Paradigm?*, 18 Fordham J. Corp. & Fin. L. 19, 31 (2012) (discussing going private transactions, and proposing that "the new shareholder profile is an irrefutable reality that justifies inquiring into whether courts should take that into account in formulating and applying fiduciary duty principles").

170. *Lynch I*, 638 A.2d at 1116–17 (citations omitted).

171. *See* Lucian Arye Bebchuk, *The Case for Facilitating Competing Tender Offers*, 95 Harv. L.Rev. 1028, 1039–40 (1982); Lucian Arye Bebchuk, *Toward Undistorted Choice and Equal Treatment in Corporate Takeovers*, 98 Harv. L.Rev. 1695, 1708–13 (1985); Martin

Lipton, *Takeover Bids in the Target's Boardroom*, 35 Bus. Law. 101, 114 (1979).

172. *E.g., Ams. Mining Corp. v. Theriault*, 51 A.3d 1213 (Del.2012), *aff'g* 52 A.3d 761 (Del. Ch.2011) (awarding damages of over $2 billion to minority stockholders for unfair dealing in merger); *Quickturn Design Sys., Inc. v. Shapiro*, 721 A.2d 1281 (Del.1998), *aff'g on other grounds* 728 A.2d 25 (Del.Ch.1998) (invalidating a slow-hand poison pill under 8 *Del. C.* § 141(a)); *Paramount Commc'ns Inc. v. QVC Network, Inc.*, 637 A.2d 34 (Del.1994), *aff'g* 635 A.2d 1245 (Del.Ch.1993) (enjoining most of Paramount's measures protecting its merger with Viacom in the face of a bid by QVC); *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173 (Del.1986), *aff'g* 501 A.2d 1239 (Del.Ch.1985) (enjoining Revlon's measures protecting its transaction with Forstmann Little in face of a bid by MacAndrews & Forbes).

and even to reverse this court when it failed to deliver a remedy the Supreme Court viewed as sufficient.[173] Given the increasing concentration of institutional investors and the demonstrated willingness of stockholders to vote against management's recommended course of actions, the potency of remedies available under our law, and statutory protections that prevent controlling stockholders from discriminating against minority stockholders and thus require them to engage in nihilism if they wish to try to starve minority investors who are probably more diversified than themselves and thus less dependent on the cash flows from the controlled company, there seems no rational reason to conclude that a majority-of-the-minority condition employed in the manner described will not provide an extremely valuable, fairness-assuring protection to minority investors. Again, distinguished scholars known for being skeptical of managerial authority in the M & A arena agree, and support using the business judgment rule standard of review when a going private merger is conditioned upfront on both the negotiation and approval of an empowered independent committee and an uncoerced, fully informed majority-of-the-minority vote.[174] And to their credit, the plaintiffs themselves do not argue that minority stockholders will vote against a going private transaction because of fear of retribution, they just believe that most investors like a premium and will tend to vote for a deal that delivers one and that many long-term investors will sell out when they can obtain most of the premium without waiting for the ultimate vote.[175] But that argument is not one that suggests that the voting decision is not voluntary, it is simply an editorial about the motives of investors and

And, of course, not all cases involving strong remedies are reviewed by the Supreme Court. *E.g., In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813 (Del.Ch.2011) (preliminarily enjoining a stockholder vote on an LBO where the sell-side bank manipulated the buy-out to generate buy-side fees, thereby extending the contractual go-shop period for an additional twenty days to allow the company to further shop itself); *In re Loral Space & Commc'ns Inc. Cons. Litig.*, 2008 WL 4293781 (Del.Ch. Sept. 19, 2008) (reforming the terms of preferred stock acquired in an interested transaction by converting those shares into non-voting common shares, a remedy that was worth at least $100 million); *Carmody v. Toll Bros., Inc.*, 723 A.2d 1180 (Del.Ch.1998) (suggesting that a so-called dead hand pill was invalid under Delaware law).

173. *E.g., Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914 (Del.2003), *rev'g* 825 A.2d 240 *and* 825 A.2d 264 (Del.Ch.2002) (invalidating a vote lock-up); *Thorpe v. CERBCO, Inc.*, 676 A.2d 436 (Del.1996), *rev'g* 1995 WL 478954 (Del.Ch. Aug. 9, 1995) (granting a remedy for a breach of the duty of loyalty where the Court of Chancery had declined to do so on the ground that the corporation had suffered no transactional damages, and re-

quiring the Court of Chancery to assess the interested party for the legal and other costs its actions imposed on the company); *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261 (Del.1988), *rev'g* 1988 WL 108332 (Del. Ch. Oct. 18, 1988) (enjoining the lock-up granted by the Macmillan publishing company to Kohlberg Kravis Roberts in a unfair auction for the company); *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del.1983), *rev'g* 426 A.2d 1333 (Del.Ch.1981) (finding that UOP had to establish the entire fairness of the cash-out of the minority UOP stockholders). Famously, such strong medicine is not confined solely to enforce the duty of loyalty. *Smith v. Van Gorkom*, 488 A.2d 858 (Del.1985), *rev'g Smith v. Pritzker*, 1982 WL 8774 (Del.Ch. July 6, 1982) (requiring the imposition of monetary damages upon independent directors who approved the sale of the Trans Union company at $55 per share, a premium of 47% over the closing price of the stock the day before the merger's announcement).

174. Gilson & Gordon, *Controlling Shareholders,* at 839–40; Subramanian, *Fixing Freezeouts,* at 60–61.

175. Pls.' Br. in Opp'n 46–50; Oral Arg. Tr. 80:12–18.

does not contradict the premise that a majority-of-the-minority condition gives minority investors a free and voluntary opportunity to decide what is fair for themselves.

Of course, as with any choice in making common law, there are costs. The loss from invoking the business judgment rule standard of review is whatever residual value it provides to minority investors to have the potential for a judicial review of fairness even in cases where a going private transaction has been conditioned upfront on the approval of a special committee comprised of independent directors with the absolute authority to say no and a majority-of-the-minority vote, that special committee has met its duty of care and negotiated and approved a deal, and the deal is approved by the minority stockholders on fair disclosures and without coercion. The difficulty for the plaintiffs is that what evidence exists suggests that the systemic benefits of the possibility of such review in cases like this are slim to nonexistent.[176] Indeed, the evidence that the possibility of such review provides real benefits to stockholders even in cases where a special committee is the only procedural protection is very slim at best, and there is a good case to be made that it is negative overall.[177] The lack of demonstrable benefit is contrasted with the clear evidence of costs, because, absent the ability of defendants to bring an effective motion to dismiss, every case has settlement value, not for merits reasons, but because the cost of paying an attorneys' fee to settle litigation and obtain a release without having to pay the minority stockholders in excess of the price agreed to by the special committee exceeds the cost in terms of dollars and time consumed of going through the discovery process under a standard of review in which a substantive review of financial fairness is supposedly inescapable.[178] This incentive structure has therefore resulted in frequent payouts of attorneys' fees but without anything close to a corresponding record of settlements or litigation results where the minority stockholders got more than the special committee had already secured. In fact, it is easier to find a case where a special committee got more than the price at which plaintiffs were willing to settle than it is to find the opposite.[179] And it is unavoidable that it is investors themselves who are injured if the litigation system does not function with a rational benefit-to-cost ratio. Ultimately, litigation costs are borne by investors in the form of higher D & O insurance fees and other costs of capital to issuers that reduce the return to diversified investors. If those

176. See *In re Cox Commc'ns, Inc., S'holders Litig.,* 879 A.2d 604, 626–34 (Del.Ch.2005) (explaining that the empirical evidence offered in that case and later published in Subramanian, *Post*–Siliconix tended to show that the bargaining power of the special committee is what drives the consideration paid in going private transactions, not the standard of judicial review).

177. Weiss & White, *File Early,* at 1856–62; see also Suneela Jain et al., *Examining Data Points in Minority Buy–Outs: A Practitioners' Report,* 36 Del. J. Corp. L. 939 (2011) (examining twenty-seven going private transactions worth over $50 million between 2006 and 2010, and drawing conclusions consistent with Weiss & White, *File Early* ).

178. *Cox,* 879 A.2d at 630–31; *In re Cysive, Inc. S'holders Litig.,* 836 A.2d 531, 550–51 (Del.Ch.2003).

179. See, e.g., Settlement Hr'g, *In re Donna Karan Int'l Inc. S'holders Litig.,* C.A. No. 18559–VCS (Del. Ch. Sept. 10, 2002) (where, following an initial proposal of $8.50 per share, plaintiffs agreed to settle at $10.50 per share, but the special committee refused to consummate the transaction at that price and ultimately secured a price of $10.75 per share).

costs are not justified in a particular context by larger benefits, stockholders are hurt, not aided. Relatedly and as important, if no credit is given for the use of both procedural protections in tandem, minority investors will be denied access to the transactional structure that gives them the most power to protect themselves. Without any clear benefit to controllers for the clear costs of agreeing upfront to a majority-of-the-minority condition—a condition that controllers know creates uncertainty for their ability to consummate a deal and that puts pressure on them to put more money on the table—those conditions are now much less common than special committees,[180] and when used are often done as part of a late stage deal-closing exercise in lieu of price moves.[181] Under an approach where the business judgment rule standard is available if a controller uses a majority-of-the-minority condition upfront, minority investors will have an incentive for this potent fairness protection to become the market standard and to be able more consistently to protect themselves in the most cost-effective way, at the ballot box.[182]

Nor are the litigation rights of minority investors unimportant even under this structure. The business judgment rule is only invoked if: (i) the controller conditions the procession of the transaction on the approval of both a special committee and a majority of the minority stockholders; (ii) the special committee is independent; (iii) the special committee is empowered to freely select its own advisors and to say no definitively; (iv) the special committee meets its duty of care; (v) the vote of the minority is informed; and (vi) there is no coercion of the minority. A plaintiff that can plead facts supporting a rational inference that any of those conditions did not exist could state a claim and go on to receive discovery. If, after discovery, triable issues of fact remain about any of those conditions, the plaintiff can go to trial and if those conditions are not found to exist by the court, the court will conduct a substantive fairness review. And any minority stockholder who voted no on a going private merger where appraisal is available, which is frequently the case, may also exercise her appraisal rights.[183] Although appraisal is not a cost-free remedy, institutional ownership concentration has made it an increasingly effective one, and there are obvious examples of where it has been used effectively.[184]

Importantly, this incentive structure can be made even more effective as an efficient and powerful way of ensuring fair treatment of the minority in going private transactions.[185] In the area of takeover defense, Delaware jurisprudence has not

---

180. *See, e.g.,* Subramanian, *Post*–Siliconix, at 11 & fig. 1.

181. For example, such a condition was added at the last moment in the *Cox Communications* transaction. *Cox,* 879 A.2d at 609–12.

182. *See Williams v. Geier,* 671 A.2d 1368, 1381 (Del.1996) ("[T]he stockholders control their own destiny through informed voting. This is the highest and best form of corporate democracy.").

183. 8 *Del. C.* § 262(a).

184. *E.g., Golden Telecom, Inc. v. Global GT LP,* 11 A.3d 214 (Del.2010) (affirming appraisal remedy award of $125.49 per share, as

opposed to merger consideration of $105 per share); *Montgomery Cellular Hldg. Co. v. Dobler,* 880 A.2d 206 (Del.2005) (affirming appraisal remedy award of $19,621.74 per share for stockholders in short-form merger, as opposed to $8,102.23 per share in merger consideration); *M.G. Bancorporation, Inc. v. Le Beau,* 737 A.2d 513 (Del.1999) (affirming appraisal remedy award of $85 per share for dissenting minority stockholders in short-form merger, as opposed to merger consideration of $41 per share).

185. *See generally Cox,* 879 A.2d at 642–48 (suggesting why controlling stockholders can be encouraged to condition a transaction on both a vote of the minority stockholders and

varied the power or equitable duties of directors because an acquirer has made an acquisition bid directly to stockholders through a tender offer not requiring director action to be consummated. Rather, our Supreme Court has made clear that the directors have the duty to respond to any takeover they believe threatens the corporation and its stockholders by reasonable means, regardless of the form of the offer.[186] In the going private area, it is not clear that a controlling stockholder who proceeds by the more coercive route of a tender offer is subject to the same equitable duties as a controller that proceeds in the manner less coercive to the minority stockholders, a merger.[187] That is so even though stockholders would seem to need the protection of independent directors more when responding to a self-interested offer by a controller than in reacting to a third party's tender offer. As this court has pointed out, if the equitable duties of controlling stockholders seeking to acquire the rest of the controlled company's shares were consistent, regardless of transactional method, a sensible, across-the-board incentive system would be created to ensure fair treatment of minority stockholders.[188]

When all these factors are considered, the court believes that the approach most consistent with Delaware's corporate law tradition is the one best for investors in Delaware corporations, which is the application of the business judgment rule. That approach will provide a strong incentive for the wide employment of a transactional structure highly beneficial to minority investors, a benefit that seems to far exceed any cost to investors, given the conditions a controller must meet in order to qualify for business judgment rule protection. Obviously, rational minds can disagree about this question, and our Supreme Court will be able to bring its own judgment to bear if the plaintiffs appeal. But, this court determines that on the conditions employed in connection with MacAndrews & Forbes's acquisition by merger of MFW, the business judgment rule applies and summary judgment is therefore entered for the defendants on all counts. IT IS SO ORDERED.

---

the approval of a special committee); *In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 443–44 & n. 43 (Del.Ch.2002) (same).

186. *See Moran v. Household Int'l, Inc.*, 500 A.2d 1346, 1350 (Del.1985) ("When a board addresses a pending takeover bid it has an obligation to determine whether the offer is in the best interests of the corporation and its shareholders. In that respect a board's duty is no different from any other responsibility it shoulders...." (quoting *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del.1985))).

187. *See Pure*, 808 A.2d at 445–46 (explaining the reason for this lack of clarity); Gilson & Gordon, *Controlling Shareholders*, at 805–27 (same); Subramanian, *Fixing Freezeouts*, at 11–22 (same).

188. *Cox*, 879 A.2d at 642–48; *see also In re CNX Gas Corp. S'holders Litig.*, 4 A.3d 397, 406–14 (Del.Ch.2010); *Pure*, 808 A.2d at 443–44.